Argued November 6, 1924, modified June 23, 1925.

# In re RIGHTS TO USE OF WATERS OF SILVIES RIVER.

### (237 Pac. 322.)

**Waters and Watercourses—Before Controlling Legislative Enactment, Appropriation Related Back to First Step Taken.**

1.  Prior to legislative enactment of 1891 (Laws of 1891, p. 52), regulating posting of notices in matter of appropriating water, it was rule that appropriation of water of stream, initiated by posting and recording of notice of appropriation, in accordance with custom, and perfected by diversion and application of water appropriated to a beneficial use within a reasonable time dated back under doctrine of relation to first step taken.

**Waters and Watercourses—Claimant's Rights Held Based on Time Appropriation was Actually Made, Without Regard to Doctrine of Relation.**

2.  Where there was no evidence that claimant of water by appropriation, prior to enactment of 1891 (Laws of 1891, p. 52), had posted or published notices in conformity with custom then existing, *held* such claimant's rights should be based on time appropriation was actually made, without regard to doctrine of relation.

**Waters and Watercourses—Evidence Held Insufficient to Establish Abandonment of Rights.**

3.  Evidence failing to establish any intent to relinquish water rights, but rather intent to delay or partly suspend application of waters to beneficial use, *held* insufficient to establish an abandonment of such rights.

**Waters and Watercourses—Rights by Appropriation not Waived by Participating in Organization of Corporation Posting and Recording Notices of Appropriation.**

4.  Right to use water, arising from a prior appropriation, is not waived or released by claimant's participation in organization of corporation, and in posting and recording of notices of appropriation, in corporate name.

**Waters and Watercourses—Sloughs as Means of Conveying Water Sanctioned Only Until Opportunity for Construction of Other Means is Afforded.**

5.  Utilization of sloughs, in construction and extension of ditches and canals as means of conveying waters to land for purposes of ir-

---

1.  What constitutes appropriation of water, see note in 60 Am. St. Rep. 799.  See, also, 27 R. C. L. 1266.
3.  See 27 R. C. L. 1283.
5.  See 27 R. C. L. 1275.

rigation, being obviously wasteful, should be sanctioned by courts only until fair opportunity to construct other artificial works is afforded.

**Waters and Watercourses—Change in Location or Extension of Ditch Does not Constitute New Appropriation.**

6. Change in location or extension of ditch, used for diverting water from stream, does not constitute a new appropriation.

**Waters and Watercourses—Evidence Held to Establish Diligence in Making Application of Water to Use.**

7. Evidence *held* to show diligence in making application of water appropriated by flour-mill to beneficial use, notwithstanding delay due to insufficiency of grain grown in community to warrant operation of mill.

**Waters and Watercourses—Reasonable Diligence Required in Application of Water to Use.**

8. In construction of necessary works and application of water to beneficial purpose, reasonable diligence and such assiduity of work as will manifest a *bona fide* intent to complete within a reasonable time only is required.

**Waters and Watercourses—Diligence in Application of Water to Use Question of Fact.**

9. Question whether reasonable diligence, in application of water to beneficial purpose, has been shown is one of fact, determinable from circumstances of particular case.

**Evidence—In Proceeding to Determine Adverse Water Claims, Reading in Evidence of Testimony Given by Witness in Prior Suit Held not Error.**

10. In proceeding for determination of adverse water claims, it was competent to read in evidence testimony which witness, dead at time of trial, had given in prior suit in federal court, involving several of same claimants, in view of Section 727, subdivision 8, Or. L.

**Stipulations—Testimony of Witness, Given in Prior Trial, Read in Evidence, Held Admissible as to All Parties Affected Thereby, in View of Stipulation.**

11. In proceeding to determine adverse water claims, where parties stipulated that testimony taken in any one contest might be used in any other contest, *held* testimony given by a witness, dead at time of trial, in a prior suit, and read in evidence by one of claimants, was admissible as to all parties whose interests were affected by the prior suit.

6. See 27 R. C. L. 1279.

7. See 27 R. C. L. 1270.

8. See 27 R. C. L. 1269.

10. Proof of death sufficient to render former testimony admissible, see note in 17 Ann. Cas. 76. See, also, 10 R. C. L. 966.

**Evidence—Rule as to Identity of Issue Necessary to Warrant Receipt in Evidence of Testimony of Witness Given on Another Trial Stated.**

12.   Under Section 727, subdivision 8, Or. L., providing that testimony of witness, deceased or out of state, or unable to testify, given in former action between same parties, relating to same matter, may be given on trial, requirement as to issue is satisfied, where issue on which former evidence is offered is common to both cases; it being immaterial that there were other issues in either case, or that subject matter of two actions be different, or that one be criminal and other civil.

**Witnesses—In Absence of Showing That Witnesses are Unavailable, Testimony Given at Prior Trial Incompetent Under Statute.**

13.   In absence of showing that witnesses are not available, record of testimony given by them in prior proceeding is incompetent under Section 727, subdivision 8, Or. L.

**Waters and Watercourses—Essentials of "Appropriation" Stated.**

14.   Intent to apply to beneficial use, existing at time or contemplated in future, a diversion from natural channel by means of ditch, canal or other structure, and an application of water appropriated within a reasonable time to some beneficial industry, are essential to valid "appropriation."

**Waters and Watercourses—Intent to Apply to Beneficial Use must be Present at Time of Appropriation.**

15.   Intent to apply water to beneficial use must be shown by all facts and circumstances to have been present in mind of appropriator at time appropriation was made or claimed.

**Waters and Watercourses—Requirement of Valid Appropriation Satisfied by Acceptance of Benefits of Natural Irrigation.**

16.   Where practically no artificial works for irrigation are necessary, requirement of a valid appropriation that there be a diversion from natural channel is satisfied, when appropriator accepts gift of nature, and indicates his intention to reap benefits of natural irrigation.

**Waters and Watercourses—Supreme Court Bound by State Engineer's Findings as to Irrigable Land.**

17.   Supreme Court, reviewing proceedings for determination of conflicting water claims, is governed by findings of state engineer, and his testimony in matter of acreage of irrigated lands.

---

12.   Identity of parties and issues as condition to admissibility of former testimony, see notes in 21 Ann. Cas. 179; Ann. Cas. 1914D, 476.   See, also, 10 R. C. L. 971.

13.   See 10 R. C. L. 969.

14.   See 27 R. C. L. 1265.

17.   See 27 R. C. L. 1272.

Waters and Watercourses—Appropriator Entitled to Reasonable Time
  to Complete Application to Beneficial Use.

18.   Where water appropriated has been partially applied, either to
a part of the land intended to be irrigated or a partial application
to all land embraced, appropriator is entitled to a reasonable time
in which, by due diligence, to complete application to beneficial use.

Waters and Watercourses—Amendment of Claim Held Properly Al-
  lowed.

19.   Amendment of claims, setting forth earlier dates of priority
than those in original statements and proof of claims, *held* properly
allowed.

Waters and Watercourses—Strict Rules of Pleading not Adhered to.

20.   In equity suits involving water rights, strict rules of plead-
ing will not be adhered to, and amendments to claims should be
liberally allowed.

Waters and Watercourses—Corporation Holding in Trust Water
  Rights of Stockholders Held Their Agent.

21.   Corporation, organized for purpose of holding in trust water
rights of stockholders, *held* mere agent for purpose of serving in-
dividual interests of stockholders.

Waters and Watercourses—Notice of Appropriation Signed by In-
  corporators Held Sufficient.

22.   Notice of appropriation *held* sufficient, though signed by incor-
porators rather than corporation, which held water rights only as
trustee for shareholders.

Waters and Watercourses—Notice of Appropriation Before Enact-
  ment of Water Law not Required to be in Writing.

23.   Before enactment of Water Law of 1891, notice of appropria-
tion was requisite, but was not required to be written, and con-
sequently did not have to express details, and might consist of acts
such as would put one on inquiry.

Equity—A Court of Equity will Look Beyond Form, and, if Possible,
  Consider Substance of Right.

24.   A court of equity will look beyond form, and, if possible,
consider substance of right.

Waters and Watercourses—Right by Appropriation cannot be Tacked
  on Right of Squatter Who has Abandoned and not Transferred
  Interest.

25.   Right of person claiming appropriation of water cannot be
tacked on right of mere squatter, who has abandoned and not
transferred his interest in land or irrigation works to claimant or
his predecessors.

---

18.   See 27 R. C. L. 1271.
20.   See 10 R. C. L. 491, 495.
24.   See 10 R. C. L. 381.
25.   See 27 R. C. L. 1284.

Waters and Watercourses—Court's Change of Findings of Water Board as to Date of Priority Held not Error, Though No Exceptions to Board's Findings.

26. Notwithstanding want of exceptions to findings of water board as to priority of rights of water claimant, it is not reversible error for court to fix an earlier date of priority for such claimant than fixed by water board.

Waters and Watercourses—Only Prejudicial Errors Examined on Appeal in Proceedings to Determine Adverse Water Claim.

27. Under Section 5745, Or. L., prescribing method of procedure in proceedings to determine adverse water claims, it is not every error that will be examined by an appellate court, but only errors prejudicial, which are pointed out with reasonable certainty; strict rules in regard to pleadings in regular suits in equity not being adhered to on appeal in such proceedings.

Waters and Watercourses—Claimant's Proof of Claim and Supplementary Statement Held Entitled to Consideration With Other Evidence on Question of Initiation of Appropriation.

28. Under Section 5740, Or. L., where notice of contest challenged date of initiation of appropriation of water by claimant's predecessor, but did not mention any specific date, and where claimant in her statement and proof of claim alleged that the lands were subject to an annual natural overflow, and fixed date of first beneficial use, *held*, though burden of proof was on claimant, her statement and proof of claim might be considered with other evidence.

Waters and Watercourses—Rights of Tranferee of Rights of Squatter on Public Land Relate Back to Time of Diversion.

29. Mere squatter on public lands may acquire an interest in right of possession thereof, that he may by parol transfer to another, in which event rights of purchaser claiming under doctrine of appropriation relate back to time of original diversion.

Waters and Watercourses — Right of Appropriation, Acquired by Squatter Obtaining Interest in Land, Held to Inure to Benefit of Grantee.

30. Right of appropriation, acquired by mere squatter, *held* to inure to her benefit when she acquired an interest therein, and to benefit of her grantee or successor in interest.

Waters and Watercourses—Failure to Proceed With Construction Work, Due to Injunction, Held not to Affect Rights.

31. Rights of incorporated irrigation company, organized before enactment of Water Code of 1909 (L. O. L., §§ 6594–6672), governed by Section 5717, Or. L., as amended, Laws of 1923, page 439, *held* not affected by failure to proceed with construction work, where delay was due to injunction.

26. See 27 R. C. L. 1272.
29. See 27 R. C. L. 1258.
30. See 27 R. C. L. 1242.
31. See 27 R. C. L. 1271.

**Waters and Watercourses — Doctrine of Appropriation Doctrine of Fixed Rights, and Decrees Fixing Rights are Res Judicata.**

32. Doctrine of appropriation may be deemed a doctrine of fixed rights, and decrees and judgments rendered in actions to adjudicate water rights may award a definite and certain quantity of water to respective parties and such decrees are deemed *res judicata* as settling rights between such parties.

**Waters and Watercourses—Common Law of Riparian Rights not Doctrine of Fixed Rights, and Judgments are Res Judicata While Conditions Remain Same.**

33. Common law of riparian rights as to use of water by riparian owners is not a doctrine of fixed rights, and judgments and decrees affecting are usually regarded as *res judicata* only so long as conditions on which they were rendered remain same.

**Waters and Watercourses — Finding not Specifically Determining Rights Under Decrees or Agreements of Parties Filed Held Improper.**

34. Finding, in proceeding to determine adverse water claims, that, in all cases where decrees of court or agreements of parties had been filed and not mentioned in court's findings, the watermaster should distribute water as between the parties to such decrees or agreements in accordance therewith, *held* improper; it being duty of court to specifically consider and pass upon any such decree or agreement of parties filed.

**Waters and Watercourses—Finding Permitting Diversion of Water from Either or Both of Two Streams Held Erroneous.**

35. Finding, in proceeding to determine adverse water claims, permitting diversion of water appropriated from either or both of two streams, *held* erroneous, and such as would be modified so as to leave amount of water to be taken from each of respective streams open for future determination.

**Waters and Watercourses—Costs not Allowed on Appeal in Proceedings for Determination of Water Claims.**

36. On appeal, in proceedings for determination of numerous adverse water claims, where findings of court affecting different claims were modified in part and affirmed in part, *held* each of parties required to pay own costs.

See (1) 40 Cyc. 721.   (2) 40 Cyc. 722.   (3) 40 Cyc. 727.   (4) 40 Cyc. 727.   (5) 40 Cyc. 715 (Anno.).   (6) 40 Cyc. 720.   (7) 40 Cyc. 712. (8) 40 Cyc. 711, 712.   (9) 40 Cyc. 712.   (10) 22 C. J. 433.   (11) 22 C. J. 428.   (12) 22 C. J. 431; 40 Cyc. 712.   (13) 22 C. J. 431.   (14) 40 Cyc. 710, 711.   (15) 40 Cyc. 710.   (16) 40 Cyc. 711.   (17) 40 Cyc. 737 (Anno.).   (18) 40 Cyc. 712.   (19) 40 Cyc. 733.   (20) 40 Cyc. 733.   (21) 40 Cyc. 826 (Anno.).   (22) 40 Cyc. 710.   (23) 40 Cyc. 710.   (24) 21 C. J. 204.   (25) 40 Cyc. 725.   (26) 40 Cyc. 737 (Anno.). (27) 40 Cyc. 733 (Anno.), 737.   (28) 40 Cyc. 733, 734.   (29) 32 Cyc. 1070; 40 Cyc. 725.   (30) 40 Cyc. 724.   (31) 40 Cyc. 712.   (32) 40 Cyc. 701, 737.   (33) 34 C. J. 808, 905.   (34) 40 Cyc. 734.   (35) 40 Cyc. 734.   (36) 40 Cyc. 738.

33.  See 15 R. C. L. 437.
36.  See 7 R. C. L. 801.

From Harney: DALTON BIGGS, Judge.

In Banc.

This is an appeal by several claimants from the adjudication of their rights to the waters of Silvies River and its tributaries. The history of this stream and section of the country, taken from the record, is about as follows:

Silvies River drainage basin is situated in the north central part of Harney County and the southern part of Grant County. The river rises in the Strawberry Mountains at an elevation of 8,000 to 9,000 feet and flows southeasterly about 80 miles to where it empties into Malheur Lake, at an elevation of about 4,000 feet above sea level. Silvies River is a perennial nonnavigable stream. Malheur and Harney Lakes have no outlets and water generally flows from the former into the latter.

There are three valleys of considerable extent, through which Silvies River flows. These valleys have but little fall. Spring floods consequently overflow considerable of the land creating meadows, marshes and swamps, the peak of the flood occurring some time in April. The run-off, prior to April 1st, is of but little benefit to the irrigators, as the ground is generally frozen or under snow until this time. Commencing at the north the first of these valleys is Bear Valley, which is situated near the headwaters of the river. It has an elevation of about 5,000 feet. The river flows through this valley from east to west and enters a deep winding canyon, which it follows southward for about 8 miles to where it enters Silvies Valley, which is the second valley of importance on this stream system. This valley has an elevation of 4,500 to 4,800 feet. The river flows

115 Or.—3

through this valley in a well-defined but shallow channel and again enters a deep canyon which it follows in a general southward direction for about 35 miles to Harney Valley, which is the largest of the three valleys. The river flows in a southeasterly direction across Harney Valley to Malheur Lake. In this valley the river has no well-defined channel, but follows numerous sloughs and depressions for nearly 30 miles and empties into the lake in several different places.

Flowing from the mountains to Harney Valley, Silvies River has a heavy grade and as a result in flood time carries out quantities of silt. Naturally as the stream reaches the valley the waters become sluggish and silt is rapidly deposited. This action has built up a delta for the river and at the upper part of the valley the river banks and bed of. the stream are higher than the valley level on either side. This makes it comparatively simple to tap the river channel with ditches and carry the water long distances on easy grades to lands bordering on the stream. Where the water overflows the banks it does not return until several thousand acres of land have been flooded and then not until the lake has been almost reached. In the spring of the year much of this valley is flooded to a depth of several feet for a short period.

Harney Valley has been aptly called the "Meat Platter" of Oregon. It is a vast level plain. Around this vast platter the hills rise forming a rim. From the north where Silvies River breaks through this rim, or emerges from the canyon, it flows through many channels or sloughs across this level valley in a southeasterly direction to the lowest part of the valley, a huge swamp known as Malheur Lake.

All of the land in Harney Valley on the east side of Silvies River embraced in this adjudication was formerly included in the Malheur Indian Reservation. On September 13, 1882, and May 21, 1883, by proclamation of the President of the United States, all of the lands of the reservation, except 320 acres occupied as a military post, were open for settlement as a part of the public domain. These lands were surveyed in 1883. The survey was proved and filed in the Lakeview Land Office in May, 1884. Prior to June, 1884, no entry could be made of this land: See *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, 75 (45 Pac. 472, 60 Am. St. Rep. 777).

Although the water users on Silvies River claim to have appropriated all the water and have used it beneficially, there is apparently sufficient water for a much greater area if it were properly handled. This is a semi-arid region and in order to produce valuable crops it is necessary to irrigate the land in this way. With water the soil will produce vegetation abundantly. In this valley all kinds of grain, grasses, vegetables and fruits have been grown successfully. From where the river enters Harney Valley on a direct line to the lake it is about 25 miles. However, the river channel is perhaps 50 or 60 miles in length and it sometimes takes a month or six weeks for the floods after entering the valley to reach the lake, resulting in considerable loss by evaporation and seepage. There are about 61,000 acres claimed to be irrigated in the valley. The water board fixed the duty of water for Harney Valley at 1/80th of a second-foot per acre, and for the region farther up the river at 1/60th of a second-foot per acre. The violent floods in the early spring are caused by the melting of the snow in the high mountains. As a rule these floods are of short duration·

but may occur any time during February, March, April and May. As a general rule they occur in May and April.

The records of the discharge of Silvies River near Burns were taken by the State Engineer from papers of the United States Geological Survey. The estimated monthly discharge of the river at that period for the year 1904 ranges as follows:

|  | Maximum. | Minimum. | Mean. | Total Acre-ft. |
|---|---|---|---|---|
| January | 42 | 6 | 24 | 1,476 |
| March | 3,268 | 235 | 791 | 48,640 |
| April | 4,730 | 629 | 2,460 | 146,400 |
| May | 2,332 | 409 | 1,057 | 64,990 |
| For 1906— |  |  |  |  |
| March | 587 | 20 | 77.5 | 4,770 |
| April | 2,010 | 587 | 1,260 | 75,000 |
| May | 742 | 259 | 416 | 25,600 |
| For 1910— |  |  |  |  |
| March | 3,050 | 382 | 1,510 | 92,800 |
| April | 815 | 336 | 628 | 37,400 |
| May | 327 | 21 | 162 | 9,960 |
| For 1914— |  |  |  |  |
| March | 1,500 |  | 758 | 46,600 |
| April | 1,800 | 697 | 1,250 | 73,200 |
| May | 655 | 198 | 372 | 22,900 |

After the first of July the river is practically dry and of no value as a source of water for irrigation.

It also appears from the engineer's report that the general practice throughout this section seems to be to let nature do the irrigating wherever it is possible. The general plan of irrigation has been to let the river channel overflow naturally during extreme floods and then as the flood subsides place dams, dikes, levees and obstructions in the channel to raise the water-level and cause further flooding. In the larger sloughs and depressions these dams and dikes

act as reservoirs, storing the water during flood period to be used for subirrigation later in the season. Naturally this is a very wasteful system of irrigation, as a large surface is exposed to evaporation. The land is injured by the application of water, too much at one time and insufficient at other times. There are but three or four instances in the valley where the methods now used approach anything like a practical irrigation system. On each of these places ditches have been constructed from the source of supply to the land to be irrigated, and there the water is distributed by means of laterals. These laterals extend at intervals of 200 to 400 feet, and subirrigation is relied upon to produce a crop. The laterals are constructed with little or no grade and the water is allowed to stand in them throughout the irrigation season. Good crops of grains, alfalfa, timothy and garden vegetables are grown on land irrigated in this way. Where the land is overflowed or flooded only wild meadow grasses can be raised. The decree prescribes that the irrigation season extends from March 20th to September 1st of each year. About 275 persons, firms and corporations filed statements and proofs. There were 265 contests filed before the water board. After the water board made its findings and order of determination and the same were filed in the Circuit Court, several exceptions thereto were filed in the Circuit Court. That court modified some of the findings and confirmed them as modified. Upon this appeal, several errors are assigned by different claimants as to the decree awarding rights to different claimants and particularly in regard to the date of priority of rights, and for a failure to award any water to certain lands.                                        MODIFIED.

For appellant Pacific Livestock Company there was a brief over the name of *Messrs. Gallagher & Kester,* with oral arguments by *Mr. T. P. Wittschen* and *Mr. P. J. Gallagher.*

For other claimants there was a brief over the names of *Messrs. McCulloch & Duncan, Mr. J. S. Cook, Messrs. Biggs & Biggs, Mr. Otis Patterson* and *Mr. George S. Sizemore,* with oral arguments by *Mr. C. B. McConnell, Mr. Erskine Wood, Mr. J. W. Biggs* and *Mr. C. A. Sweek.*

BEAN, J. — The Pacific Livestock Company, a claimant to water rights for a large area of land in Harney Valley and Silvies Valley, filed in the Circuit Court several exceptions to the findings by the water board, and now appeals from the decree of the Circuit Court assigning errors therein. Taking these matters somewhat in the order they are presented, and following as near as we can the form of tabulation of rights adopted by the water board, we make the following findings; that this company filed thirteen claims for various properties in Silvies Valley, and that the company assigns error in regard to nine of the claims.

### Silvies Valley Land.

Silvies Valley is narrow, averaging about one mile in width. A large part of the water used for its irrigation immediately drains back into the river. The irrigation in this valley, during the early part of the season, to a certain extent, acts as a reservoir for the waters of the river, making them valuable below later in the season. Such irrigation cannot injuriously affect anyone in Harney Valley. There

is no contest between any Harney Valley water users and the irrigators in Bear Valley, or Silvies Valley.

## BEYERS' EAST SIDE AND WEST SIDE DITCHES.

In regard to the land of the Pacific Livestock Company, under the Beyers' East Side and West Side ditches, the testimony of those who settled in the Silvies Valley during the eighties, among others, that of John Craddock, who came to the valley in 1885, is to the effect that Beyers constructed a dam in the river in 1887 and ditches were started the same year.

We think the testimony shows that the ditches were practically completed in 1888 and the water first applied to a beneficial use during that year. There is in evidence a recorded water location or notice by Charles Beyers, recorded October 14, 1887, in the water records of Grant County, Oregon, but we find no evidence of a notice of appropriation having been posted on the bank of the river at the place of the intake of the proposed ditch, or elsewhere.

1. Before the legislative enactment of 1891 providing for posting of notices in the matter of appropriating water, and the regulations in regard thereto, it was a recognized rule that the appropriation of water of a stream, initiated by the posting and recording of a notice of appropriation, in accordance with a custom, and perfected by diversion and application of the water to a beneficial use within a reasonable time, dates back under the doctrine of relation to the first step taken: *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59 (45 Pac. 472, 60 Am. St. Rep. 777, note). Such a rule may be said to have become established, under varying circumstances and conditions, in this state.

2. The claimant, Pacific Livestock Company, does not show that the several notices of water location

relied upon by it were posted in conformity to the custom prevailing during the eighties, and we find no testimony that the notices were posted in any manner: 1 Wiel on Water Rights (3 ed.), 405, § 375. Therefore, the Pacific Livestock Company is not in a position to invoke the rule suggested by it, and we think that the date of relative priority should be fixed at the time the appropriation was actually made without regard to the doctrine of relation.

3. After the ditches were constructed in 1888, the water was applied to a beneficial use by irrigating the land of the settlers who owned it at that time and who constructed the ditches. Mr. Dan Camblin testified that the Beyers dam was put in the river at the head of these ditches in 1888 and that the ditch was constructed as far as the Tracy place, and afterward extended south to Section 36, Tp. 18 S., R. 31 E., W. M., where the water was turned into a slough, and then dams placed in the slough to throw the water out to irrigate the land. On the east side of the river the construction of the Beyers ditch was commenced about the same time and the ditch was built down on the east side of the river nearly through the holdings of the Pacific Livestock Company at the present time along the river in the valley. For several years these ditches were used by the settlers who then owned the land in the irrigation of the same. Afterward the land passed to the ownership of the Pacific Livestock Company and for some time was principally devoted to the pasturing of livestock.

It is in evidence by the early settlers that the Silvies River and its branches and various sloughs overflow and spread the water over large areas of adjacent land. This occurs every year when there

is a fair quantity of water and at intervals of four
or five years the river has overflown to a width of
a mile; so that a considerable portion of the land is
really irrigated without the use of ditches. The
amount flooded is increased by the construction of
dams in the river and its branches and connecting
sloughs.

About 1912 the company inaugurated a change in
its use of the land in the Silvies Valley from pastur-
ing to raising hay, and commenced the reconstruc-
tion of the Beyers ditches on both sides of the river
in practically the same location and within a year
or two completed the ditches, extending them south,
practically through the land of the company. While
there was a change in the use of much of the land
after it came into the ownership of the company, and
the use of the water from these streams was per-
haps lessened to a certain extent, we do not think
that the testimony indicates an abandonment of the
water right. It does not appear to have been the
intention of the company to relinquish its rights to
the use of these waters but rather to delay or partly
suspend the application of the waters to a beneficial
use.

4. Another question is raised in regard to a con-
siderable portion of this land. About the time of the
reconstruction of the Beyers ditches, applications
were made to the State Engineer by the company
for permits to appropriate water through these
ditches. The record indicates that this was done to
protect the water rights of the claimant Pacific Live-
stock Company and not with the intent of waiving
any right which the company formerly had. The
act of applying for permits from the State Engineer
was analogous to the posting of notices of appropria-

tion under the statute prior to the enactment of the Water Code. A party having a right to the use of the water of a stream for the purpose of irrigating land by virtue of a prior appropriation, by organizing a corporation and participating in the posting and recording of a notice of appropriation in the name of such corporation, or posting notices of appropriation and recording the same in order to strengthen his rights in his own name, does not necessarily waive or relinquish his right to the water which he had prior to such posting of a notice: *In re Grande Ronde River,* 113 Or. 211 (232 Pac. 626); *In re Hood River,* 114 Or. 112 (227 Pac. 1065); *Eldredge* v. *Mill Ditch Co.,* 90 Or. 590 (177 Pac. 939); *Oregon Const. Co.* v. *Allen Ditch Co.,* 41 Or. 209 (69 Pac. 455, 93 Am. St. Rep. 701, note). The claimant Pacific Livestock Co. also cites upon this point *Newport Water Co.* v. *Kellogg,* 31 Idaho, 574 (174 Pac. 602); *Osgood* v. *El Dorado etc. Water Co.,* 56 Cal. 571.

The following award will be made:

| Name & P. O. | Date of Rel. Priority | Amt. Cub. Ft. per Sec. | No. of Acres. | Name of Ditch or Stream. | Desc. of Land or Place of Use. |
|---|---|---|---|---|---|
| Pac. Livestock Company | 1888 | | 28 | Beyers East side & West side Ditch Silvies River | 10 ac. NE.¼ SE.¼ <br> 18 ac. SE.¼ SE.¼ <br> Sec. 24, Tp. 18 S., <br> R. 31 E., W. M. |
| Pac. Livestock Company | 1888 | | 346 | ac. Beyers E. & W. Ditches | 36 ac. NE.¼ NE.¼ <br> 39 ac. SW.¼ NE.¼ <br> 38 ac. SE.¼ NE.¼ <br> 35 ac. NE.¼ SW.¼ <br> 20 ac. SW.¼ SW.¼ <br> 40 ac. SE.¼ SW.¼ <br> 40 ac. NE.¼ SE.¼ <br> 39 ac. NW.¼ SE.¼ <br> 29 ac. SW.¼ SE.¼ <br> 30 ac. SE.¼ SE.¼ <br> Sec. 25, Tp. 18 S., <br> R. 31 E., W. M. |

| Name & P. O. | Date of Rel. Priority | Amt. Cub. Ft. per Sec. | No. of Acres. | Name of Ditch or Stream. | Desc. of Land or Place of Use. |
|---|---|---|---|---|---|
| Pac. Livestock Company | 1888 | | 344 | ac. Beyers E. & W. Ditches | 40 ac. NE.¼ NE.¼ 10 ac. NW.¼ NE.¼ 40 ac. SW.¼ NE.¼ 30 ac. SE.¼ NE.¼ 40 ac. NE¼ NW¼ 32 ac. NW.¼ NW.¼ 32 ac. SW.¼ NW.¼ 40 ac. SE.¼ NW.¼ 40 ac. NE.¼ SW.¼ 40 ac. NW.¼ SW.¼ Sec. 36, Tp. 18 S., R. 31 E., W. M. |
| Pac. Livestock Company | 1888 | | 228 | ac. Beyers E. & W. Ditches | 38 ac. SW.¼ SW.¼ 40 ac. SE.¼ SW.¼ 30 ac. NE.¼ SE.¼ 40 ac. NW.¼ SE.¼ 40 ac. SW.¼ SE.¼ 40 ac. SE.¼ SE.¼ Sec. 36, Tp. 18 S., R. 31 E., W. M. |
| Pac. Livestock Company | 1888 | | 37 | ac. Beyers E. & W. Ditches | 8 ac. NE.¼ SW.¼ 14 ac. NW.¼ SW.¼ 15 ac. SW.¼ SW.¼ Sec. 18, Tp. 18 S., R. 32 E., W. M. |
| Pac. Livestock Company | 1888 | | 287 | ac. Beyers E. & W. Ditches | 24 ac. NW.¼ NE.¼ 25 ac. SW.¼ NE.¼ 29 ac. NE.¼ NW.¼ 10 ac. NW.¼ NW.¼ 24 ac. SW.¼ NW.¼ 39 ac. SE.¼ NW.¼ 38 ac. NE.¼ SW.¼ 25 ac. NW.¼ SW.¼ 23 ac. SW.¼ SW.¼ 40 ac. SE.¼ SW.¼ 10 ac. NW.¼ SE.¼ Sec. 19, Tp. 18 S., R. 32 E., W. M. |
| Pac. Livestock Company | 1888 | | 494 | ac. Beyers E. & W. Ditches | 30 ac. NE.¼ NE.¼ 40 ac. NW.¼ NE.¼ 5 ac. SW.¼ NE.¼ 10 ac. SE.¼ NE.¼ 40 ac. NE.¼ NW.¼ 26 ac. NW.¼ NW.¼ 28 ac. SW.¼ NW.¼ 40 ac. SE.¼ NW.¼ 34 ac. NE.¼ SW.¼ 38 ac. NW.¼ SW.¼ 35 ac. SW.¼ SW.¼ 40 ac. SE.¼ SW.¼ 15 ac. NE.¼ SE.¼ 38 ac. NW.¼ SE.¼ |

| Name & P. O. | Date of Rel. Priority | Amt. Cub. Ft. per Sec. | No. of Acres. | Name of Ditch or Stream. | Desc. of Land or Place of Use. |
|---|---|---|---|---|---|
| Pac. Livestock Company | 1888 | | 494 | ac. Beyers E. & W. Ditches | 40 ac. SW.¼ SE.¼ 25 ac. SE.¼ SE.¼ Sec. 1, Tp. 19 S., R. 31 E., W. M. |
| Pac. Livestock Company | 1888 | | 8 | ac. Beyers E. & W. Ditches | 8 ac. SE.¼ SE.¼ Sec. 11, Tp. 19 S., R. 31 E., W. M. |
| Pac. Livestock Company | 1888 | | 136 | ac. Beyers E. & W. Ditches | 38 ac. NE.¼ NW.¼ 38 ac. SE.¼ NW.¼ 25 ac. NW.¼ SW.¼ 35 ac. SW.¼ SW.¼ Sec. 12, Tp. 19 S., R. 31 E., W. M. |
| Pac. Livestock Company | 1888 | | 22 | ac. Beyers E. & W. Ditches | 22 ac. NW.¼ NW.¼ Sec. 13, Tp. 19 S., R. 31 E., W. M. |
| Pac. Livestock Company | 1888 | | 21 | ac. Beyers E. & W. Ditches | 12 ac. NE.¼ NE.¼ 9 ac. SE.¼ NE.¼ Sec. 14, Tp. 19 S., R. 31 E., W. M. |

5. It has long been the custom in Oregon to utilize sloughs and depressions in the ground in the construction and extension of ditches and canals as a means of conveying water to lands for the purposes of irrigation. Such means, however, are obviously wasteful and do not serve the purpose of utilizing the waters of a stream to their full extent in the application of water to a beneficial use, and should be sanctioned only until a fair opportunity is had to construct ditches or canals and pipe-lines, or other artificial works, where necessary, to conserve the water and minimize the waste thereof so as to irrigate as large an area as possible, consistent with practical irrigation and good husbandry.

Natural irrigation, in the crude manner indicated, apparently applies only a portion of the water to a real beneficial use.

The Pacific Livestock Company assigns error in the adjudication of 345.5 acres of its Trout Creek lands, which were awarded a date of priority of

1883. The company also claims that this date should be April 9, 1883, the date of the recording of notices of appropriation by F. G. Blume and R. J. Zilkey, the former owner of the lands. These notices are in the same category as other notices mentioned above, in that the record does not show that the notices were posted at any time, consequently the doctrine of relation would not apply. The date of relative priority would be the time of actual construction of the ditches and appropriation of the water. The claimant, the Pacific Livestock Company, has no cause of complaint in this respect.

Fred Otley and other claimants assign error in the award by the court to this company as to its Trout Creek lands. This award will be modified so as to be as follows:

| Name & P. O. | Date of Rel. Priority. | No. of Acres. | Name of Ditch or Stream | Desc. of Land or Place of Use. |
|---|---|---|---|---|
| P. L. S. Co. | 1883 | 236.5 | Trout Creek | 40 ac. NW. ¼ NE. ¼ |
| P. L. S. Co. | 1883 | | Trout Creek | 27.5 ac. SW. ¼ NE. ¼ |
| | | | | 40 ac. SE ¼ NE. ¼ |
| | | | | 40 ac. NE. ¼ NW. ¼ |
| | | | | 12 ac. SE. ¼ NW. ¼ |
| | | | | 17 ac. NE. ¼ SE. ¼ |
| | | | | Sec. 13, Tp. 19 S., R. 31 E., W. M. |
| | | | | 20 ac. SW. ¼ NW. ¼ |
| | | | | 40 ac. NW. ¼ SW. ¼ |
| | | | | Sec. 18, T. 19 S., R. 32 E, W. M. |
| P. L. S. Co. | 1891 Jan. 19 | 91 | Trout Creek | 24 ac. NE. ¼ NE. ¼ Sec. 13, T. 19 S., R. 31 E., W. M. |
| | | | | 28 ac. SW. ¼ SW. ¼ |
| | | | | 39 ac. SE. ¼ SW. ¼ Sec. 18, T. 19 S., R. 32 E. W. M. |
| P. L. S. Co. | 1892 Oct 1 | 18 | Trout Creek | 18 ac. NE. ¼ SW. ¼ Sec. 18, T. 19 S., R. 32 E., W. M. |

The company's Payne Creek property, known as the Payne homestead, was settled on in 1888, and thereafter a ditch was built to take water on to the

land. The prevailing conditions are shown by John L. Hopper, who owns adjoining land and who has been acquainted with the place since 1899. There are fully fifty-five acres of good meadow-land on the place. The application of water in the irrigation of the land is evidenced by the record. The fifty-five acres of the Payne place should be added to the amount awarded by the water board and the Circuit Court with a date of priority of 1899, making the award as follows:

| Name | Date of Rel. Priority | No. of Acres | Name of Ditch or Stream | Desc. of Land or Place of Use. |
|------|------|------|------|------|
| P. L. S. Co. | 1899 | 55 | Payne Creek | 30 ac. SW.¼ SW.¼ 5 ac. SE.¼ SW.¼ Sec. 17, Tp. 18 S., R. 31 E., W. M. |
| P. L. S. Co. | 1899 | | Payne Creek | 15 ac. SE.¼ SE.¼ Sec. 18, Tp. 18 S., R. 31 E., W. M. 5 ac. NW.¼ NW.¼ Sec. 20, Tp. 18 S., R. 31 E., W. M. |
| P. L. S. Co. | 1888 | 70 | Camp Creek Owens Ditch | 40 ac. SW.¼ SW.¼ Sec. 25, T. 17 S., |
| | | | Camp Creek | R. 31 E., W. M. |
| P. L. S. Co. | 1888 | | Owens Ditch | 30 ac. SE.¼ SE.¼ Sec. 26, T. 17 S., |
| | | | Camp Creek | R. 31 E., W. M. |
| P. L. S. Co. | 1906 | 95 | Owens Ditch | 35 ac. SE¼ SE.¼ |
| | | | | 30 ac. SW.¼ SE.¼ 20 ac. SE.¼ SW.¼ 10 ac. SW.¼ SW.¼ Sec. 34, T. 17 S., R. 31 E., W. M. |

## CAMP CREEK SCHROEDER APPROPRIATION.

The claimant, Pacific Livestock Company, asserts the right for 355 acres with a priority of 1888. The water board and court awarded no right to this land. The testimony of the engineer of the company, W. A. Griffin, shows that he went to Silvies Valley in the spring of 1914 and afterward became

familiar with the company land. He testifies as to the number of acres susceptible of irrigation and embraced in this claim, which he ascertained from a survey. W. H. Schroeder, a brother of John Schroeder, testified that he settled in Silvies Valley on Camp Creek in the fall of 1888; that his brother John had located there about two years before. W. H. Schroeder left the valley in December, 1889. He stated that his brother John located a claim on Camp Creek before the witness went there. Afterward, that he also located a claim; that when he came to the valley his brother had a dam near the upper end of his place, and a little ditch on the south side of Camp Creek; that he and his brother built a ditch on the north side of the creek in the fall of 1888 and spring of 1889 and repaired the dam; that the ditch went through his brother's land and on to his; that he used the ditch one season for a short time in 1889. The ditch was perhaps one-half mile long and about twenty inches or two feet wide on the bottom. Since he left there he has been over the land once, three or four years ago. Most of the places are sage-brush land. That he cleared up and fenced some of the land; that his brother fenced forty or fifty acres and cleared some; that the land was not fenced when he passed through there three or four years before, he testified; that when he passed through at that time he noticed a ditch on the south side of Camp Creek that had been built after he was there. That he sold his land to the company and that his brother also sold. "I don't recall whether he sold first, or whether I sold first." Mr. Griffin states that the land was scattered sage-brush land, no meadow-land. The awards for this and other lands will be as follows:

| Name | Date of Rel. Priority | No. of Acres | Name of Ditch or Stream. | Descr. of Land or Place of Use. |
|---|---|---|---|---|
| P. L. S. Co. | 1889 | 150 | Camp Creek Schroeder Approp. | 30 ac. NE.¼ NE.¼<br>40 ac. SE.¼ NE.¼<br>30 ac. SW.¼ NE.¼<br>10 ac. NE.¼ SW.¼<br>40 ac. NW.¼ SW.¼<br>Sec. 35, T. 17 S.,<br>R. 31 E., W. M. |
| P. L. S. Co. | 1889 | 688 | Camp Creek Miller Approp. | 35 ac. NW.¼ NE.¼<br>40 ac. SW.¼ NE.¼<br>40 ac. NE.¼ NW.¼<br>40 ac. SE.¼ NW.¼<br>38 ac. NW.¼ SE.¼<br>35 ac. SE.¼ SE.¼<br>40 ac. NW.¼ SE.¼<br>40 ac. SE.¼ SE.¼<br>40 ac. NE.¼ SW.¼<br>40 ac. SE.¼ SW.¼<br>Sec. 36, T. 17 S.,<br>R. 31 E., W. M. |
| P. L. S. Co. | 1888 | 140 | Cottonwood Creek | 30 ac. NW.¼ NE.¼<br>30 ac. SE.¼ NE.¼<br>25 ac. NE.¼ SE.¼<br>15 ac. SE.¼ SE.¼<br>40 ac. NW.¼ SE.¼<br>Sec. 1, T. 18 S.,<br>R. 31 E., W. M. |

The following awards will be modified so as to read as follows:

| Name | Date of Rel. Priority | No. of Acres | Name of Ditch or Stream. | Descr. of Land or Place of Use. |
|---|---|---|---|---|
| P. L. S. Co. | 1887 | 144 | Bridge & Poison Creek | 40 ac. NE.¼ NW.¼<br>25 ac. NW.¼ NW.¼<br>40 ac. SE.¼ NW.¼<br>39 ac. NE.¼ SW.¼<br>Sec. 18, T. 18 S.,<br>R. 32 E, W. M. |
| P. L. S. Co. | 1888 | 78 | Jump Creek | 40 ac. NE.¼ NW.¼<br>38 ac. SE.¼ NW.¼<br>Sec. 12, T. 18 S.,<br>R. 31 E., W. M. |

## D. L. Camblin.

Sections 12 and 13, Tp. 18 S., R. 31 E., W. M.

It appears from the record that the claimant D. L. Camblin made a homestead entry for the land in 1885 and has resided thereon since 1886; that he commenced to raise crops and irrigated the land for that purpose in 1886, taking the water from Jump Creek; that he increased the area which he irrigated and raised crops on the west side of the river every year until it was all in meadow and irrigated. This

land of Camblin's on the west side of the river in Sections 12 and 13, Tp. 18 S., R. 31 E., W. M., should be awarded a date of relative priority of 1886. It appears that the claimant has ten acres on the east side of the river in Section 12, which was omitted from the survey and which has been irrigated from Bridge Creek since 1888, and should be awarded a water right with a date of 1888.

6. The change made in the ditch, taken from the river in 1913, was a mere relocation in the place of taking out the water and not a new appropriation. The water was diverted from the same stream system. The extension of Camblin's ditch on the west side of the river, which was constructed in 1886, to his other land, does not appear to have been an enlargement or a new appropriation, but rather the completion of the application of the water to a beneficial use. This was done with due diligence and within a reasonable time. See *In re Hood River*, 114 Or. 112 (227 Pac. 1065). The right should not be subordinated to those claimed by virtue of natural irrigation, or a partial natural use of the water, without any artificial works or actual irrigation. The award of D. L. Camblin will be made as follows:

| Name & P. O. | Date of Priority. | No. of Acres. | Name of Stream or Ditch. | Description of Land or Place of Use. |
|---|---|---|---|---|
| Camblin, D. L. Seneca, Ore. | 1886 | 50.1 | Flat Creek | 20.6 ac. NW.¼ NE.¼ 29.5 ac. SW.¼ NE.¼ Sec. 13, T. 18 S., R. 31 E., W. M. |

Note: The land in NW.¼ NE.¼ also has a water right from Jump Creek under date of 1913.

| Name & P. O. | Date of Priority. | No. of Acres. | Name of Stream or Ditch. | Description of Land or Place of Use. |
|---|---|---|---|---|
| Seneca, Ore. | 1886 | 65.7 | Silvies R. | 11.1 ac. SW.¼ SE.¼ 17.63 ac. SE.¼ SE.¼ |
| Seneca, Ore. | 1886 | | Jump Creek | 18.47 ac. NW.¼ SE.¼ 18.50 ac. SW.¼ SE.¼ |
| Seneca, Ore. | 1888 | 10 | | 10 ac. E. of river Sec. 12, T. 18 S., R. 31 E., W. M. |

Note: The land in the NW.¼ SE.¼ also has a water right from Silvies River under date of 1913. All of Camblin's land on east side of river has a water right date of 1888.

115 Or.—4

CLAIMS OF WALTER CROSS, NELLIE HARDESTY, CORRA M.
SHEPHARD AND JESSIE J. SHEPHARD.

Walter Cross was awarded a right for 287 acres
of land from East Trout Creek and Trout Creek,
with a date of priority of 1883. The land is situate
in Sections 5 and 6, T. 20 S., R. 32 E., W. M., and
Section 31, T. 19 S., R. 32 E., W. M.

Nellie Hardesty was awarded a right for fifty-four
acres from Trout Creek and small streams, with a
date of priority of 1883, lands in Section 7, T. 20 S.,
R. 32 E., W. M.

Cora M. Shephard and Jessie J. Shephard, co-
owners as heirs, were awarded a right for fifty-five
acres from Trout Creek with a date of priority of
1883. The land is situate in Section 7, T. 20 S., R.
32 E., W. M.

It appears from the record that Walter Cross set-
tled upon a pre-emption claim in 1883, being a por-
tion of the land involved, put in a dam in east Trout
Creek, constructed a small ditch and plowed a tract
of ground that year. The ditch was so dug that it
turned the water into a low depression which caused
it to flow over the land. He irrigated a small amount
of the land the first year and has used the system
of irrigation ever since that date. In about fifteen
years he put in another dam. That he has raised
hay for twenty-five years; that he had irrigated all
of his land for twenty years, and some of it for a
longer time.

It appears that one Stephen Woods was interested
with Walter Cross in the dam put in East Trout
Creek in 1883. Woods irrigated his place from the
same source. Cross and Woods posted a notice of
appropriation, claiming 500 inches of the waters of
Little Creek, or East Trout Creek, to be taken out

at the place of posting the notice and conveyed in ditches and flumes to their land claims, and used for stock and irrigating purposes, and recorded the notice on August 21, 1883. Woods irrigated some of his land in 1884. Since then both places have been irrigated and 250 to 275 tons of hay have been cut annually thereon. The Woods place is known as the Jewett place. It was purchased by Walter Cross in 1911 and is now owned by him.

It appears that on October 13, 1884, J. L. Cross made a homestead entry for the SE. ¼ of the NW. ¼ and the SW. ¼ of NE. ¼, the NE. ¼ of the SW. ¼, the NW. ¼ of the SE. ¼ of Section 7, T. 20 S. R., 32 E., W. M.; that he settled upon the land in 1883. J. L. Cross died in 1900, leaving a will devising the N. ½ of this tract of land to Nellie L. Cross, now Nellie L. Hardesty, and the S. ½ of the tract to Jane Cross, later Jane Shephard. This portion is now owned by the children of Jane Shephard, Cora M. Shephard and Jessie J. Shephard.

It appears that the elder J. L. Cross, now deceased, irrigated the land from the time he settled there. He built a dam in the channel of Trout Creek and constructed a small ditch and also irrigated from two small creeks on the east side of Trout Creek. Within a reasonable time after the first irrigation, all of the land for which a water right is claimed was prepared and irrigated. Due diligence appears to have been observed in the construction of ditches and dams and in the application of the water to the beneficial use of irrigation.

From a careful reading of the testimony of these claimants and also of the contestant we are led to believe that the rights of Walter Cross, Nellie L. Hardesty, Cora M. Shephard and Jessie J. Shephard

are prior in time and superior to those of the contestant, Pacific Livestock Company.

In the contest of the *Pacific Livestock Company* v. *H. A. Dillard*, it appears that the SW. ¼ of the SE. ¼ of Section 18, the W. ½ of the NE. ¼ and the SE. ¼ of the NE. ¼ of Section 19, T. 20 S., R. 32 E., W. M., was settled upon in 1885 and patent issued August 16, 1891. The tract is now owned by H. A. Dillard. It is shown that there was a ditch on the place in 1885 and that Smith irrigated about 70 acres therefrom. The land has since been cultivated and irrigated, the area of the land being gradually increased by a small amount. H. A. Dillard is entitled to a date of priority of 1885.

CLAIMS OF PETER CLEMENS, FRANK J. WHITING AND J. C. CLEMENS, HIS SUCCESSORS, AND WILLIAM STEWART AND T. J. BAKER.

Each party appealed from the award of F. J. Whiting and J. C. Clemens, successors in interest of Peter Clemens, deceased, and the awards to T. J. Baker and William Stewart. Baker and Stewart were awarded by the court a date of priority of 1884. The rights of these parties in the water from Poison Creek, which is treated as a tributary of Silvies River, conflict.

We will first consider the claims of F. J. Whiting and J. C. Clemens: Peter Clemens, now deceased, the predecessor in interest of F. J. Whiting and J. C. Clemens, who was alive at the time of the original hearing and testified as a witness in support of his claim to water from Poison Creek for 555 acres in Sections 22 and 27, Tp. 22 S., R. 31 E., W. M., stated in substance, that he came to that country in the fall of 1882; that he commenced to irrigate his land in 1883 by means of overflow and that he put in a ditch

in 1884 and at that time posted a notice of appropriation of 1,000 inches of water from Poison Creek, which was recorded in Grant County, April 21, 1884; that he raised wild hay on the meadows and grain and some alfalfa on the land. He stated that he had cultivated the high land for twenty years; that it was broken during the eighties; that there is a slough from Poison Creek which connects with the east branch of Foley's slough. He also put in a few dams in the slough; that he irrigated the land continuous after he got it prepared. We find no contradiction of this testimony.

It appears that Peter Clemens made use of the water from Poison Creek for the irrigation of his land in 1883. In the spring of 1884 he posted and recorded a notice of appropriation and proceeded with due diligence to construct a ditch and dams, and also diligently cultivated a portion of the land and applied water to the irrigation of the same, and also to his meadow-land, continuously thereafter. According to the doctrine of relation, and taking all the facts and circumstances into consideration, Frank Whiting and J. C. Clemens, the successors in interest of Peter Clemens, or the Peter Clemens' land of 555 acres, is entitled to a date of priority of April 21, 1884.

Considering now the claims of William Stewart for the NE. ¼ and the N. ½ of the SE. ¼, Section 33, and the SE. ¼ of the SE. ¼, Section 28, Tp. 22 S., R. 31 E., W. M., and J. T. Baker for the W. ½ of the NW. ¼ and the NE. ¼ of the NW. ¼ and the NW. ¼ of the NE. ¼, and the SE. ¼ of the NW. ¼ and the NE. ¼ of the SW. ¼ and the NW. ¼ of the NE. ¼, the NW. ¼ of the SE. ¼ of Section 34, Tp. 22 S., R. 31 E., W. M., J. H. Culp, witness for these two claimants, testified to the effect that he had known the Baker and Stewart lands since 1886; that

the Baker land was irrigated from Poison Creek and two springs; that it has been irrigated every year since that time and hay and grain raised thereon; that from the appearance of the meadow hay had been cut thereon before 1886; that there were improvements and buildings on the land when he first knew it; that it was natural hay land; that the Stewart land was settled upon at the time he first knew it; that part of it was natural wild meadowland; that forty acres of the SE. ¼ of Section 28 was practically all irrigated and also the NE. ¼ of Section 33; that there were natural ditches and sloughs that spread out over the land, and a spring or two that the land received water from.

J. T. Vickers stated as a witness, in substance, that he had known the Baker and Stewart places since 1879. As to the character of those lands, that "it was kind of overflow and marshy and water standing around in sinks." He called it the sink of Poison Creek. That the biggest portion of it produced a good crop of wild grass; that since that time he had not been on the place "only just passing by since." That about 1882 or 1883 "they started in on haying and fencing them"; that he had seen hay cut on the land most every year since 1883.

Mr. J. L. Poujade testified that he came to that country in July, 1880. He had lived in the neighborhood since that time. He was acquainted with the Stewart and the Baker places; that he helped cut hay in 1883; that there was hay cut on the land before that; that they have cut hay on the land practically every year since that time.

J. T. Baker, claimant, testified to the effect that he had lived on the place since 1890. It was all fenced then and had buildings several years old. It was irrigated from Poison Creek and springs. They

used water from Poison Creek from about the 25th of May to the 1st of June; and after that from the springs; that when Poison Creek is high the water naturally spreads out over a good deal of his land; that he constructed ditches and dams below the springs in Section 34, and that he used the water continuously since he went upon the place, without any claim being made thereto by anyone else until the last year (1920); that one of the springs rises on his own land.

Mr. William M. Stewart testified that he had lived on his land since May 4, 1896; that the SE. ¼ of the SE. ¼ of Section 28 was practically all irrigated when he purchased it also, the NE. ¼ of Section 33 was irrigated at that time. The land was irrigated from Poison Creek the early part of the season and the latter part, from the 1st of June on, from two springs, one of which was on his land in Section 28; that the water from Poison Creek spreads out over all of the SE. ¼ of Section 28 and the NE. ¼ of Section 33, and the N. ½ of the S. ½ of this section; that he has used the water from these sources since he has been there without any interference from anyone until last year. The first ditch upon the land was built in 1900.

Mr. George D. Hagey, witness for claimants, stated that he first knew the Stewart and Baker places in 1887; that he put up hay on the Stewart land four years. That he had not been on the place for twenty years, until three months before he testified; that they were in the same condition now as they were when he knew them, except as to dams and ditches; that when he was working on the Stewart land he could see over the other place practically as well as the one on which he worked; that he drove right

along beside it; that "there is no ditches there to bother the mower. Nothing at all. Just cut right over everything."

Considering all the testimony, we think that the claim of Peter Clemens was prior in time and superior in right to the claims of William M. Stewart and J. T. Baker for water from Poison Creek; that William M. Stewart should be awarded a date of 1884 later than April 21st for 260 acres, partially irrigated from Poison Creek and partly from a branch of Foley's slough. His other date of priority awarded by the court of 1900 for 165 acres is affirmed.

The award to J. T. Baker for 320 acres of land in Section 34, Tp. 22 S., R. 31 E., W. M., to be irrigated from Poison Creek with a date of 1884, should be deemed later than April 21, 1884, and subsequent to the claim of Peter Clemens, now made by Frank J. Whiting and J. C. Clemens, his successors in interest. In regard to the water from the springs arising on the land of these claimants, that matter is regulated by Section 5797, Or. L., which provides as follows:

"Ditches for Waste, Spring, or Seepage Water. All ditches now constructed, or hereafter to be constructed, for the purpose of utilizing the waste, spring, or seepage waters of the state, shall be governed by the same laws relating to priority of right as those ditches constructed for the purpose of utilizing the waters of running streams; provided, that the person upon whose lands the seepage or spring waters first arise, shall have the right to the use of such waters."

### JAMES H. BUNYARD LANDS.

This claimant claimed a right for 484.65 acres. The right was initiated November, 1893, by the construction of a ditch for the irrigation of 165.95 acres. The claimant was awarded a right by the water board

for 165.95 acres with a date of priority of 1889; 160 acres with a date of priority of 1898; 158.70 acres with a date of priority of 1894.

The court awarded Bunyard a water right for 124.82 acres with a date of priority of 1889; 100 acres with a date of priority of 1898; 158.70 acres with a date of priority of 1898.

Mary Bunyard, administratrix of the estate of James H. Bunyard, deceased, complains upon this appeal of the reduction of the acreage made by the court and also of the change of the date of priority of the right for lands in Section 7, Tp. 24 S., R. 32 E., W. M., from 1894 to 1898.

The map of the State Engineer shows that all of the land in Section 1 claimed by Bunyard is irrigated and should be allowed a water right. James H. Bunyard testified that he settled on his pre-emption claim in Lots 6 and 7 and SW. ¼, NW. ¼ of lot 2 of Section 1, Tp. 24 S., R. 31 E., W. M., in 1886 or 1887, and filed upon the land as soon as it was surveyed and subject to entry; that it was natural meadowland and about all irrigated. He constructed a ditch in the fall of 1889. He used the land purely for raising hay and cut from 160 to 180 tons of hay each season. He purchased the SE. ¼ of Section 1 (same Tp. and range), known as the Willett's tract, which was settled upon about three years after Bunyard made settlement. The land is naturally overflowed. About 100 tons of hay are usually cut on the Willett tract. It is irrigated by means of a dam or levee in the slough, and some water from a ditch. The Willett's tract was irrigated when they had possession of it.

The testimony of M. V. Dodge, an opposing witness, shows there is but little difference in the elevation of the Bunyard land in Section 21. The opposing testimony does not show that this land is not all

susceptible of irrigation. The other tract claimed by the Bunyard estate is known as the Lewis tract which Mr. Bunyard bought in 1893. He stated that a very little of this land was surface irrigated; that about 30 acres was overflowed and some subirrigated. The land is principally what is called sage-brush land. The testimony is meager and vague as to what has been done in the way of irrigation, and we find no testimony to authorize a change in the date of priority from that made by the Circuit Court. The James H. Bunyard land, now claimed by Mary Bunyard, administratrix of the estate of J. H. Bunyard deceased, is awarded a right, and the decree of the Circuit Court will be modified as follows:

| Date. | No. of Acres. | Ditch. | Stream. | Description. |
|---|---|---|---|---|
| 1889 | 165.95 | Marrs Co. | Main | 41.13 ac. Lot 6 (NE.¼ NW.¼) |
| | | | | 41.52 ac. Lot 7 (NW.¼ NW.¼) |
| | | | | 40 ac. SW.¼ NW.¼ |
| | | | | 43.30 ac. Lot 2 (NW.¼ SW.¼) |
| 1898 | 160 | | | 40 ac. in NE.¼ SE.¼ |
| | | | | 40 ac. in SE.¼ SE.¼ |
| | | | | 40 ac. in SW.¼ SE.¼ |
| | | | | 40 ac. in NW.¼ SE.¼ |
| | | | | Sec. 1, Tp. 24 S., R. 31 E., W. M. |
| 1898 | 158.70 | | | 39.84 ac. Lot 1 (NE.¼ NE.¼) |
| | | | | 39.84 ac. Lot 8 (NW.¼ NE.¼) |
| | | | | 39.51 ac. Lot 7 (SW.¼ NE.¼) |
| | | | | 39.51 ac. Lot 2 (SE.¼ NE.¼) |
| | | | | Sec. 7, Tp. 24 S., R. 32 E., W. M. |

## Pacific Livestock Company vs. Burns Flour Milling Company.

The Burns Flour Milling Company was awarded a priority of 1884 for the irrigation of 83.9 acres in Sections 36 and 1, Tp. 22 S., R. 30 E., W. M. The mill company was also awarded a date of priority of 1884 for power purposes. The mill ditch or race is 16 feet wide at the top and 8½ feet wide at the bottom and 4.3 feet deep. The water has been utilized for making flour and also for electric light purposes,

and in the irrigation of the lands for the raising of fruits, vegetables and other products.

The Pacific Livestock Company alleges error in the award of the priority of 1884 for 26.7 acres in said Section 1, and also error in the priority for power purposes and contends that the date of priority for the mill should be 1900.  On November 3, 1884, N. Brown, the predecessor in interest of the Burns Flour Milling Company, claimant, posted on Silvies River at the point of the proposed diversion near Burns, describing the point, a notice of appropriation of water to the amount of 5,160 cubic feet (Leffel's double turbine water-wheel measurement) to be taken out of the river in said Section 36, and duly recorded the notice November 6, 1884.  Brown purchased the land described in Section 36, now owned by the mill company, from the State of Oregon, intending to build a flour-mill thereon, and commenced construction of a dam in the river and another in an arm thereof in 1884, and began construction of the ditch or mill-race that year, dug the ditch and took water to the mill site a year or two afterward.

The dam and ditch were constructed for the purpose of diverting water for furnishing power for a flour-mill and for irrigation.  He soon after constructed a building for a mill and finished the same about 1888.  At that time but little grain was raised in Harney Valley.  For two or three years the attempt to raise grain was unsuccessful on account of frost, grasshoppers, crickets and other obstacles, and the grain raisers became discouraged and it was several years later before they began raising it in quantities.  There was "nothing for the mill to grind," or not sufficient grain raised in the valley to justify running a mill until about 1899, when ma-

chinery was installed in the mill and they commenced the successful operation of the same in making flour.

In the meantime the dam was kept up and water ran through the mill-race, a portion of which was used for irrigation. The irrigation of land in Section 36 was commenced as soon as they got water in the mill-race. After passing through the wheel the water runs back into the river channel on the land of the mill company. After the construction of the first dam, it washed out, and they constructed a new dam about a half a mile below the old dams, but did not impound any more water by means of the new dam than they did by the first dams. The appellant contends that the water appropriated for power purposes was not applied to a beneficial use within a reasonable time and that no sufficient excuse for not making such application is shown by the testimony.

7. The record shows that under all the circumstances of the case this claimant and its predecessor used due diligence in making an application of the water to a beneficial use. At the time of the initiation of the right that part of the country was in an early stage of development. Being remote from any railroad or means of water transportation, the purpose of raising grain and manufacturing flour was for local consumption. Dams were constructed for impounding the water and a ditch or mill-race made to convey the same to the mill site and a building was erected for a mill. Further progress was delayed until sufficient grain was raised in the valley for the practical operation of a flouring-mill. When the grain was grown, machinery was installed in the mill building for manufacturing the grain into flour and other products. It would have been futile to have equipped the mill and allowed it to remain idle and rust and deteriorate a few years before it could be utilized.

8. The test, both in the construction of the necessary works and in the application of the water to a beneficial purpose, is reasonable diligence.

9. There must be by such assiduity of work of construction as will manifest to the world a *bona fide* intention to complete it within a reasonable time. The question is one of fact and must be determined from the surrounding circumstances in each particular case: *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, 91 (45 Pac. 472, 60 Am. St. Rep. 777); *Seaward* v. *Pacific Livestock Co.,* 49 Or. 157 (88 Pac. 963); *In re Willow Creek,* 4 Or. 592 (144 Pac. 505, 146 Pac. 475); *In re Hood River,* 114 Or. 112 (227 Pac. 1065–1067), and cases there cited.

The quantity of water awarded this claimant is not involved upon this appeal. The date of priority of 1884 awarded the Burns Flour Milling Company for power purposes by the Circuit Court is affirmed.

The Burns Flour Milling Company was awarded a right for 26.7 acres in Section 1, Tp. 22 S., R. 31 E., W. M. This land was purchased by Mr. Brown, the predecessor of claimant in 1901. Neither he nor claimant made any appropriation or intended to make any appropriation of water for this land in Section 1 prior to the date of its purchase. The matter of irrigating the 26.7 acres in question was not contemplated at the time the notice was posted or the first appropriation was made. As to this portion of the appeal, it must be sustained and the award of the Burns Flour Milling Company for land in said Section 1 will be modified by changing the date of relative priority from 1884 to 1901 for all of the 26.7 acres.

### Evidence.

10. At the time of the taking of the testimony before the water board, in the present proceeding,

claimant Pacific Livestock Company introduced and read into the record the testimony of J. S. Devine, now deceased, given in the United States Circuit Court for the District of Oregon in the case of *Pacific Livestock Company* v. *William D. Hanley et al.* Several of the claimants objected to the testimony and contended that it is not competent. The testimony of other witnesses in the federal court was also read into the record which we will hereafter refer to.

The rule governing the admissibility of the testimony of these witnesses is embraced in Section 727, Or. L., subdivision 8, which provides that, "the testimony of a witness, deceased or out of the state, or unable to testify, given in a former action, suit, or proceeding, or trial thereof, between the same parties, relating to the same matter," may be given on the trial. It is conceded that the witness, John S. Devine, was dead at the time this record was introduced. His testimony was given in a former action in the federal court.

A reading of Devine's testimony clearly indicates that it was relating to the same matter as that to which it relates in the present proceeding, namely, the history of the early settlement, cultivation, fencing and construction of artificial works for, and the irrigation of, the land of the claimant. The testimony was taken upon the trial of the case in the federal court on September 5, 1900. It is contended by the respondent claimants, particularly William Hanley Company, that in the present proceeding "the issues are not the same" as those in the federal court. The suit in the federal court was different in form from the present proceeding but the object and purpose, as we understand the decree, was in a general way to regulate the irrigation of large tracts of land involved in the present proceeding. We referred to this

question in the case of *Obermeier* v. *Mortgage Company Holland America et al.,* 111 Or. 14 (224 Pac. 1089, 1092 et seq.).   See, also, *Laam* v. *Green,* 106 Or. 311, 319 (211 Pac. 791); *Beard* v. *Royal Neighbors,* 60 Or. 41 (118 Pac. 171).

Under the record we think that the testimony of Devine given in the federal court was competent and binding, as between the Pacific Livestock Company, the plaintiff, in the federal suit, and W. D. Hanley, and Wm. Hanley Company, his successor in interest in several sections of land involved in this proceeding, and the various other parties to the federal decree, and their successors in interest who are interested in the present proceeding.

11. The main part of the testimony in this proceeding was taken in the contests that were initiated.   At the commencement of the hearing before the water commissioner there was a general stipulaton entered into between various water users, which recites thus— "it being the purpose of this stipulation that all testimony taken in one contest may also be used in that other contest and it being understood that the purpose of this stipulation is to avoid taking the same testimony in this proceeding more than once." We think this stipulation has an influence in making the testimony of Devine admissible as to all the parties to the stipulation whose interests are affected thereby.   The testimony is unquestionably admissible as between the Pacific Livestock Company and Wm. Hanley Company, and the other water users who were parties defendant to the suit in the federal court.   The issues at the former trial of the suit were the same, or substantially the same, as the issues in the present proceeding.   Opportunity for cross-examination at the former trial was ample.

12. As a general rule, the requirement as to the issue is satisfied where the issue on which the former evidence is offered is common to both cases. It is immaterial that there were other issues in either case, that the subject matter of the two actions is different, or that the first action was criminal and the second is civil. In the present proceeding there are large tracts of the same land involved that were in question in the suit in the federal court while there are other issues pertaining to other land in the present proceeding: 22 C. J. 430, § 515; 10 R. C. L. 966, § 143. See, also, 3 Wigmore (2 ed.), § 1387, where it is declared in substance that the issue on the occasion when the former testimony was given must have been substantially the same. Mr. Wigmore there says: "The situation is one that calls for common sense and liberality in the application of the rule and not a narrow and pedantic illiberality." In a proceeding of this kind a liberal rule should be invoked in order to ascertain the truth, especially in regard to the early settlement of the country, or as early as the eighties.

13. The contestant, Pacific Livestock Company, also introduced into the record the testimony of Ira Venator and Isador Poujade. It is not shown that these witnesses were not available, but it is stated one or both were in Harney Valley. No reason is shown why these witnesses were not called and sworn in. No necessity appears for introducing the record of the former testimony. We do not consider it competent. We are not aware that the testimony is of vital importance.

### Appropriation.

14. As a general rule, to constitute a valid appropriation of water, three elements must exist: (1) an

intent to apply it to a beneficial use, existing at the time or contemplated in the future; (2) a diversion from the natural channel by means of a ditch, canal or other structure; and (3) an application of it within a reasonable time to some useful industry: *Low* v. *Rizor*, 25 Or. 557 (37 Pac. 82). It is said in Black's Pomeroy on Water Rights, § 48, in regard to the intent, that—

"The fundamental doctrine is well settled that the appropriation must be made with a *bona fide* present design or intention of applying the water to some immediate useful or beneficial purpose, or in present *bona fide* contemplation of a future application of it to such a purpose, by the parties thus appropriating or claiming."

15. In the present case it may be said, in regard to the first requirement to constitute a legal appropriation of water, that it is the present *bona fide* design or intention of applying it to some immediate beneficial use, or the appropriation must be made in the present *bona fide* contemplation of a future application of it to such a purpose; it should be shown in all its fullness by the facts and circumstances to have been present in the mind of the appropriator at the time the appropriation was made or claimed.

When the water is utilized and the appropriator reaps the fruits thereof, in the harvesting of hay, grain or depasturing the land irrigated or in some other way, of course such intent plainly appears. The provision for future contemplated use affords an opportunity for the completion of a system of irrigation works leveling or preparing land for the reception of the water or construction of a mill or power plant, as the case may be, all of which cannot be done in the ordinary course at the time the appropriation is made.

115 Or.—5

16. The rule as to the second requirement or diversion of the water has a special application or exception to much of the land in Harney Valley. It involves the matter of the natural irrigation of the land. Nature has been very generous to Harney Valley in this respect. With practically no artificial works for irrigation, thousands of acres are naturally watered. When will the date of appropriation be fixed in such cases? It would seem to be fair and equitable, if not absolutely essential, that such date be deemed to be when the proprietor of the land accepts the gift made by nature, and garners the produce of the irrigation by harvesting or utilizing the crops grown on the land, or making preparation for so doing, or in some substantial way indicates that it is his intention to reap the benefit of the fruit of the irrigation. When no "ditch, canal, or other structure" is necessary to divert the water from its natural channel, the law does not vainly require such works, prior to an appropriation. We do not intend to suggest that in most cases the building of some kind of an irrigation system is not requisite after the appropriation is made in order to effect an economical beneficial use of such water and prevent waste. This should be accomplished within a reasonable time as circumstances permit and necessities require, to the end that the greatest practical benefit possible may be obtained by the economical use of the water of the stream. In this way the natural system of irrigation can be changed to a control system.

We understand that the latter system is contemplated by the water users of Harney Valley, by impounding the waters of Silvies River and by construction of more complete artificial irrigation works

or systems. When this is consummated there will be less danger of a scarcity of water.

PACIFIC LIVESTOCK COMPANY'S HARNEY VALLEY LANDS.

The appellant, Pacific Livestock Company, upon this appeal complains that the Circuit Court so changed the award of the water board that about 2,000 acres of its Harney Valley lands were deprived of water, and 3,500 acres, or the remaining lands, were only given half a water right. In addition this company complains that approximately 3,600 acres of its lands were given a later priority than that establised by the water board, and priorities of other claimants were changed to the disadvantage of the company.

This company claims error in all changes made by the Circuit Court in the water board's awards, and also in not sustaining its exceptions to certain orders of the water board. This necessitates an examination of the testimony concerning the separate awards made to the Pacific Livestock Company and pertaining to the other alleged errors.

Charles Cronin, who was a manager for Todhunter & Devine, the predecessors in interest of Pacific Livestock Company and commenced such services in July, 1885, relates that at that time the headquarters of the firm were on the Island Ranch, the same as at the present time; that Todhunter & Devine, the predecessors in interest of the Pacific Livestock Company, then owned and operated the ranch; that the S. ½ of Section 27 and Sections 28, 29 and 30, Tp. 24 S., R. 32 E., W. M., were all fenced when he came there, and some of the fences appeared to be ten years old. The fences inclosed practically all of the "low land." He remained in the valley until 1904. A portion of the land was claimed under

a swamp-land title which failed, and the fence on the east was moved on the line of the land now owned by the present company. Afterward other lands were acquired by the company, farther up the valley. The land was used principally for the raising of cattle and horses; at times as many as 15,000 head of cattle being kept on the home place and the range in the vicinity thereof.

WARM SPRINGS SCHOOL SECTION.

In Section 36, Tp. 23 S., R. 30 E., W. M., the water board awarded the Pacific Livestock Company a water right for 471 acres with a date of priority of 1888, and the Circuit Court awarded it 373 acres with a full right, and 45 acres with a half right, a total of 418 acres with the same date of priority.

It appears that Todhunter made an application for this land in 1879. There are three warm springs to the west of this land, two of which flow on this property. From the northern one a ditch was constructed. Ditches were built across the field in different places to spread the water over the land. The first work done on the northern spring was 1888, consisting of ditches made across the section. Later they built a big ditch along the north and east of the field and constructed levees to spread the water. Work was done on the ditch in the spring of 1888. The east half of the section receives water from the river by means of overflow. The land has been irrigated regularly ever since 1888. The contention in regard to this is a difference in the survey, or number of acres.

The water board approved a survey of the amount of irrigable land of 471 acres. We think a full water right should be awarded for that number of acres, with a priority of 1888.

## Potter Swamp.

Part of the land under this designation was denied a water right by the court. It is described as follows:

NE. ¼ of the SE. ¼.
NW. ¼ of the SE. ¼, Section 7, Tp. 24 S., R. 31 E., W. M.

According to the State Engineer's map there are forty acres of irrigable land in each subdivision. The survey of the engineer of the claimant gives the same number of acres. There are 1,240 acres besides the two subdivisions known as the Potter swamp-land which were awarded a date of priority of 1885 by the Circuit Court and 160 acres with a date of priority of 1895. This involves only a question of survey. The Pacific Livestock Company is awarded a water right for 40 acres additional, with a priority of 1885.

## Hudspeth School Section.

A question arises upon this appeal in regard to the N. ½ of this section. The water board made the following awards with a priority of 1887:

40 ac. NE. ¼ NE. ¼
13 ac. NW. ¼ NE. ¼
21½ ac. SW. ¼ NE. ¼
40 ac. SE. ¼ NE. ¼
28 ac. NW. ¼ NE. ¼
10½ ac. SW. ¼ NW. ¼
17 ac. SE. ¼ NW. ¼
Sec. 16, Tp. 23 S., R. 31 E., W. M.

The Circuit Court decreased the area of the award.

The testimony shows in part that Mr. Todhunter acquired this land in 1883. It was fenced in 1887. Hay has been cut on a portion of the land. On account of the land having been used as a kind of depot, or stopping place for holding cattle in driving them to and from the range, the land is used principally for pasturage. Three main sloughs carry

water from the river on to the land. The overflow from the river and from an arm of Foley's slough floods a portion of the east part during some years. They also took water from Lampshire slough and constructed levies and dams to spread the water. About three fourths of the section has been irrigated. The State Engineer's map indicates that the north one half of this section has sage-brush growing with the grass and is not in a high state of cultivation, apparently for the reason that it has been used for pasturage. With proper cultivation and perfected irrigation it is quite likely that the north half of this section in question would be very productive. It is not to be supposed that a piece of land like the one in question could all be put in condition for irrigation at one time. Many areas which are cultivated and irrigated are added to gradually as circumstances permit. For more detailed discussion of this question, which space will not allow here, see *In re Hood River*, 114 Or. 112 (227 Pac. 1065).

The record shows that the claimant is entitled to a water right for the number of acres awarded by the water board as above set forth. This right, however, should be conditioned upon the thorough irrigation of the land. The Pacific Livestock Company is allowed five years from the date of the entry of the decree herein in the Circuit Court to make complete application of the water to the number of acres awarded in the north half of this Section 16, or such further time as may be allowed by the State Engineer upon proper application thereof.

MILLER SCHOOL SECTION.

Section 36, Tp. 23 S., R. 31 E., W. M.

In this section there is a difference of 115 acres in the area claimed from that allowed by the Circuit

Court, which pertains to the question of engineering or computing the number of acres irrigated. We have examined the testimony, which will occupy too much space to narrate in these findings, and we will endeavor to refer to it in a general way hereafter. We find no difference in the land of this section. In conformity to the map of the State Engineer, the claimant is awarded 640 acres in this section with the date of priority of 1887, as given by the court.

### Smith and Clemens Place.

Section 4, Tp. 24 S., R. 31 E., W. M., and Sections 33 and 34, Tp. 23 S., R. 31 E., W. M.

The company claims 1,860 acres. The court awarded a water right for 1,612.5 acres. The testimony shows that the various settlers who first settled upon and formerly owned the land made improvements thereon from time to time and gradually put to a beneficial use and irrigated all of the land susceptible of irrigation in the three sections mentioned. They constructed artificial works to put the water on the high places and drained it off from the low places. No question is raised in regard to the dates of priority. There is a question in regard to the number of acres of irrigable land. The survey made by the State Engineer as shown by his maps and fortified by the maps of the engineer of the claimant, supplemented by the testimony of the witnesses, warrants the following award of a full water right to the Pacific Livestock Company as to these three sections as tabulated:

768.5 acres with date of priority of 1887.
320   acres with date of priority of 1889.
131.5 acres with date of priority of 1893.
640   acres with date of priority of 1900.

### Mace Ditch.

In the SW. ¼ of SW. ¼ of Section 1 and Section 2 and the S. ½ of Section 10, Section 11, and Sections 12

13, 14, 24, all in Tp. 24 S., R. 31 E., W. M., and the
N. ½ of SW. ¼, Sec. 7, Tp. 24 S., R. 32 E., W. M.,
the record calls for the following awards to the
above-mentioned land of the Pacific Livestock Company, namely, a full water right for:

> 673   acres with a date of priority of 1887.
> 631.5 acres with a date of priority of 1888
> 203   acres with a date of priority of 1893.
> 97.5  acres with a date of priority of 1894.
> 255   acres with a date of priority of 1897.

as tabulated by the water board in its findings of
fact and order of determination. There is a difference in the exact number of acres of this class of
lands which was awarded a water right, and, also,
289 acres which was awarded "one half a water
right." The date of relative priority is not questioned. The State Engineer's survey and map
shows 1889 acres; and the survey of the claimant's engineer, as shown by a map in the record,
and the award made by the water board indicates
that in the sections of land mentioned there are
1,860 acres which are irrigated from the waters
of Silvies River. The court awarded a full water
right to 1,519.5 acres and one-half water right to
289 acres.

### Marr's Ditch and Dam.

In Section 7, Tp. 24 S., R. 32 E., W. M., the Pacific
Livestock Company was awarded by the water board
a water right with a priority of 1887 for the following:

> 20 ac. NE. ¼ NW. ¼
> 24 ac. NW. ¼ NW. ¼
> 10 ac. SW. ¼ NW. ¼
> 37.5 ac. SE. ¼ NW. ¼

17. This land and many other tracts were surveyed and resurveyed by the State Engineer. The
map of the State Engineer shows a total of 107 acres

of this land as irrigated.   The map of Mr. Griffing, the engineer of the claimant, shows 91.5 of irrigable land.   The Circuit Court awarded a one-half water right to 70 acres of this land.   We cannot make the survey.   The statute imposes that duty upon the State Engineer in the first instance and we are governed by his findings and the testimony in the matter, from which we award the claimant a full water right for 91.5 acres of this land, as tabulated by the water board in its findings of fact and order of determination, with a date of relative priority of 1887.

### CHAPMAN SLOUGH COUNTRY.

Sections 15, 16, 21, 22 and 23, Tp. 24 S., R. 31 E., W. M. (as Tabulated by the Water Board on Page 70 of Its Findings of Fact and Order of Determination).

There is a difference in the award made by the Circuit Court and the water board of 61 acres, which is involved in this appeal.   Only a small fraction of the lands of the claimant in these various sections is classed as irrigated.   For the general reasons hereinafter given, the claimant is awarded a full water right for 739 acres of land in the section mentioned, with the dates of relative priority as fixed by the water board and the Circuit Court.

### CRONIN AND RIM ROCK DAM.

Sections 25 and 26, Tp. 24 S., R. 31 E., W. M. (Tabulated on Page 73 of the Decree of the Lower Court).

The claimant seeks to obtain a water right for 137.5 acres in these two sections in addition to the award made by the Circuit Court.   A similar question to those above mentioned as to the survey and

the computation of the number of acres occurs. There is no controversy as to the dates of priority. A part of the lands in three of the subdivisions of Section 26 come under the School Teacher's ditch and are listed on page 74 of the decree of the Circuit Court, and also on page 72 of the order of determination of the water board.

The company is awarded as irrigated by means of the Cronin and Rim Rock dams, 548.5 acres in Sections 25 and 26, as tabulated on page 71 of the findings of fact and order of determination of the water board, with the dates of priority as fixed by the Circuit Court and the water board. This award does not include the portion of the land under the School Teacher's Ditch.

## Elk, Poujade and Foley Dams.

Sections 29, 30, 31, 32, Tp. 24 S., R. 32 E., W. M., and Section 36 in Tp. 24 S., R. 31 E., W. M. (Tabulated on pp. 73 and 74 of Decree).

The lands embraced in this class are in the sections as above named. The Circuit Court made an award of a water right to 1,281 acres in these sections. The water board made an award of 1,576 acres.

In regard to Sections 29, 30 and 31 there is no material difference between the award made by the court from that made by the water board. In Sections 32 and 36 the appellant claims a water right for about 295 acres more than allowed by the Circuit Court. In making the tabulation the water board approved the survey made by Griffin as to the number of acres. There was but little difference between his survey and that of the State Engineer. It appears these sections were resurveyed by the State Engineer assisted by Messrs. Cooper and Dodge.

Some of this land was settled upon before a survey of the same was made. The record shows that the settlement on Section 36, Tp. 24 S., R. 31 E., W. M., was made by one Lassell in 1882, Jennie Bailey in 1884 and W. F. Meglemere and Charles McGuire in 1886. It is claimed that the other land was settled upon as follows: That the NW. ¼ of Section 34, Tp. 24 S., R. 32 E., W. M., was applied for by Mr. Todhunter as swamp-land in 1879. The NE. ¼ of that section was the Jones homestead entered in 1887. The balance consists of the Collier homestead settled in 1886 and the Lassell pre-emption was settled in 1881, and the Schultz agricultural college land was applied for in 1883. Section 32 in the same township and range consists of the Schultz agricultural college land applied for in 1882; Lassell homestead entered in 1882 and Fry pre-emption entered in 1882.

The land in Section 29, same township and range, consists of the Cronin pre-emption settled in 1886 and the land in Section 30 consists of the Modie homestead settled in 1888. The testimony shows that the land included in this claim is in the neighborhood of the Island ranch buildings and is claimed to be the first land settled in the valley; that the irrigation works on these sections are also used to turn the water into the sloughs leading to the south, and that the water is carried southerly and southeasterly and assists in the irrigation of the main body of the land irrigated from the west fork of Silvies River. The Foley and Morrell dams also turn the water easterly on to Section 33, Tp. 24 S., R. 32 E., W. M., and Section 4 of Tp. 25 S., R. 32 E., W. M.

The testimony of the old settlers, who were witnesses in the case mentioned in the federal court, to which we have referred, pertains to these sections of land and other land. John S. Devine, who for-

merly transacted the business for Todhunter & Devine, the predecessors in interest of the Pacific Livestock Company, testified to the effect that he came to Harney Valley in 1874 and engaged in the cattle business; that he purchased two ranches known as the Venator and Cooksie places. While he occupied the Island ranch the greatest number of cattle that he had at one time was 25,000 head. They ranged over the valley in the summer and were kept on the Island ranch in the winter. The buildings or headquarters of the Island ranch are located near the corner of Sections 29, 30, 31 and 32, Tp. 24 S., R. 32 E., W. M. The cattle wintered east and south of the headquarters on the Island ranch and got their hay food principally in Tp. 25 S., R. 32 E., W. M., and also ranged north of the ranch-house. They cut about 2,000 tons of hay in Tp. 25 S., R. 32 E., W. M., and Tp. 24 S., R. 31 E., W. M. The land was irrigated from Silvies River; that without irrigation the grass and hay would not have grown and the land would have been valueless; that they occupied the land in Tp. 25 S., R. 32 E., W. M., before they knew to whom it belonged and during the time it was being surveyed by the United States surveyor; that they fenced the land in Tp. 25 S., R. 32 E., W. M., and a portion of Tp. 25 S., R. 32½ E., W. M., and a portion of Tp. 26 S., R. 32 E., W. M., and also in 1883 or 1884.

For the purpose of turning water out of the west fork of Silvies River for irrigation, he had dams put in several places along in the river. They were the Lassell dam, the Elk dam and the Poujade dam and the Morrell dam. That when those dams were put in he did not know of any other dams that were in the river above his place, nor any dam in the river at any place in Harney Valley up the canyon;

that the lands were intersected by sloughs, the water from which irrigated the land on each side. The river channel continues to be deep down to Section 10, Tp. 25 S., R. 32 E., W. M., and then spreads all over the country. Beside the big field they also had Rimrock field west of the house. They cut hay on that and used it for pasture. It was irrigated by water from the river; they also cut hay in Sections 10, 11, 16 and 2, Tp. 24 S., R. 31 E., W. M. This was also watered from the river.

The witness further testified that when he commenced his operations and put in these dams and turned the water out, there were very few people living in the valley; that the first dam put in the river, outside of his dam, was the Harney Valley dam, Ditch and Irrigation Company's dam.

J. C. Foley testified in part as follows: That he came to Harney Valley in 1883 and has lived there practically ever since. He worked for Todhunter and Devine in 1885 and part of 1886 and for the Pacific Livestock Company in 1889 and until 1897. His headquarters were on the Island ranch. He was there in 1888; that when he went there in 1889 he found three dams in the river; that the land of claimant received water from the Harney Valley Dam and Ditch Company system; the Hog Pen dam, now called the Foley dam, in the northeast quarter of Section 31, near the company's buildings, the dam in the NE. 1/4 of Section 36, Tp. 24 S., R. 31 E., W. M., marked as the Jones dam, and the dam marked as the Poujade dam; that the Poujade dam appeared to be two or three years old when he first saw it; that later they put in two dams to turn the water on to the land and built some ditches out on the sage-brush land. The ditch was about ten feet wide on the bottom and about three feet deep.

Charles Cronin testified in regard to the cultivation and irrigation of this land during the time he had charge of work on the ranch. Ben Newman also testified in detail in regard to the artificial works constructed to irrigate the land; that the land in Sections 31 and 32, Tp. 24 S., R. 32 E., W. M., has been irrigated ever since he first helped cut hay on the land in 1898; that Sections 29 and 30 were irrigated in the same manner as Section 31; that when he first knew the Foley dam it was an old structure.

We approve the survey of the number of acres allowed by the water board and the decree will be modified so as to allow a water right to the Pacific Livestock Company in this class of land for 1,576 acres, as tabulated by the water board in its findings of facts and order of determination at pages 71 and 72.

SCHOOL TEACHER'S DITCH, DAMS IN RIVER, CHAPMAN'S SLOUGH AND BIG DITCH.

The lands under this classification in Sections 26, 27, 35, 11, 12, 13, 14 and 25 in Tp. 25 S., R. 31 E., W. M., and Sections 5, 6 and 7, Tp. 25 S., R. 32 E., W. M., tabulated on pages 74 and 75 of the decree, are entitled to an award of a water right in favor of the Pacific Livestock Company for 2,412.5 acres in the various subdivisions as listed or tabulated by the water board in its findings of fact and order of determination with this exception; the following change will be made:

28 ac. NW. ¼ SW. ¼
25 ac. SW. ¼ SW. ¼
27 ac. SE. ¼ SW. ¼
Section 13, Tp. 25 S., R. 31 E., W. M., with a priority of 1897.

This makes an additional allowance in these three subdivisions of land for 20 acres in accordance with

the map of the State Engineer. All the other subdivisions in sections enumerated, the acreage will remain as listed by the water board. The lands in this class were given three dates of priority; 442 acres in 1885 priority, 359 acres of land under School Teacher's ditch, an 1891 priority, and 1,591.5 acres and the other lands an 1897 priority.

It is contended by appellant, Pacific Livestock Company, that all the land in Sections 12, 13, 14, 23 and 24, Tp. 25 S., R. 31· E., W. M., should be given a date of priority of 1885. It appears that in 1897 the company constructed what is known as the Big ditch, or Wright's Point ditch, which brought under irrigation for the first time much of the land in the sections last mentioned. It is claimed by the company that all the land last mentioned received water from the river by means of sloughs and low depressions, or overflow, from the river before the ditch was constructed.

It appears that the land has been used principally as pasture since 1898; that after the water came down through the Big canal it went over the land in question; that the body of land has received water from the west fork of the river, through the Big canal, since 1898. The east part of the tract was cut for hay.

The Cronin ditch was built in the fall of 1902. The purpose of that was to connect the two channels together, and drain the land so that hay could be cut on it, and also to keep the ice off of it in winter. The channel was made to control the water and drain it off. That they made a cut known as the School Teacher's cut in 1891; that they could force the water out by the Elk dam through a slough or depression that came out near the old Poujade dam and then carry it through sloughs to Sections 5 and 6; that

the sloughs in Sections 5 and 6 got water before the School Teacher's cut was made, during the extreme high water; that in extreme high water the water backed up from "this swamp in here." In the construction of the Poujade and other dams, some distance to the north of this land, the water of the river was turned southerly and southwesterly into sloughs and low places and incidentally reached this land prior to the building of the Big ditch. Some of the water naturally flowed from the river, passed over other land, and eventually reached the land in question.

Ditching was done on two tracts in 1886 all through this strip of country. The Cronin ditch, as stated by one witness, "It was to drain them swamps, that wet land, that overflowed land." There was also a dam in the head of the ditch so as to throw the water out over the land, if they wanted to; also, other ditches intended as drainage ditches. In places they would have the effect of improving the character of the hay crops; that a field known as the Red S. field was used almost altogether for pasture, where they wintered some 5,700 head of cattle. The cattle would bed in the tules and be protected thereby during the stormy weather.

We do not find that any lateral ditches or dams or other artificial works were constructed on or near the tracts for the purpose, or with the intent of appropriating the water for this particular land until the construction of the Big ditch in 1898. Before that time the water, for the most part, took its natural course and followed the sloughs and low depressions. The water board allowed an early date of priority for some of these lands. While it is a difficult question to solve, and we have devoted much study thereto, and made a careful examination of

the record, we are unable to see that the findings of the water board and the Circuit Court as to the dates of priority are not as correct and equitable as they can be made from the record.

It would be of great assistance, no doubt, to make a survey or examination of the land. This privilege the water board had. The relation of the dates of priority is, of course, the important factor. In many instances, governed by this record, the matter is at best an estimate. Under all the circumstances the dates of priority as fixed by the water board for the tracts in question, will be affirmed.

CRONIN DITCH, WEST FORK SLOUGH AND NUMEROUS SMALL DITCHES.

The lands classified under this heading are situate in Tp. 25 S., R. 32 E., W. M., the subdivisions in this township of the claimant, Pacific Livestock Company, are tabulated in the decree of the Circuit Court at pages 76, 77, 78 and 79, and in the order of determination of the water board on pages 74, 75, 76.

The appellant raises three questions in regard to the award in this township. The first is the objection to the acreage allowed which, like the other tracts of land, involves a survey. There is a difference of 391 acres between the award made by the water board and that made by the Circuit Court in this township. In Sections 4, 8, 9, 10, 15 and 16, there is but little difference in the award as to the acreage. In Section 17, with the exception of the NE. ¼ of the NE. ¼, the State Engineer and the engineer for the claimant found all the lands fully irrigated. The court did not award a water right to all of the lands shown to be irrigated on the map of the State Engineer. In Section 18 the court also

deducted from its allowance some of the land listed by the State Engineer, or shown on the map of the engineer of the claimant in instances where the water board followed that survey. In Section 19 the water board made an award as to acreage, differing slightly from either the Griffing map and also in some part from its own map. The award made by the court is 48 acres less than that made by the water board. In Section 20 there is a small difference between the awards. In Section 21 and in some of the other sections it is claimed that there are slight errors in the tabulations and in several instances the court awarded only a half water right.

As to Section 22, appellant contends that the award made by the water board should be approved. As to Section 23 the only complaint is in regard to failure to allow a full water right as to part of the land. In Section 26, the court awarded no water right for this section. The water board awarded a right to 21 acres.

The decree of the Circuit Court as to the land of claimant Pacific Livestock Company in Tp. 25 S., R. 32 E., W. M., will be modified as follows, as far as the same pertains to the acreage to which a water right was awarded. In Section 19 the award will be in accordance with the survey of the State Engineer as shown by his maps as follows:

| | | | |
|---|---|---|---|
| 40 ac. NE.¼ NE.¼ | 20 ac. NW.¼ NW.¼ | 8 ac. SW.¼ SW.¼ | 12 ac. SE.¼ SE.¼ |
| 40 ac. NW¼ NE¼ | 20 ac. SW.¼ NW.¼ | 13 ac. SE.¼ SW.¼ | |
| 15 ac. SW.¼ NE.¼ | 0 — SE.¼ NW.¼ | 40 ac. NE.¼ SE.¼ | |
| 36 ac. SE.¼ SE.¼ | 20 ac. NE.¼ SW.¼ | 34 ac. NW.¼ SE.¼ | |
| 35 ac. NE.¼ NW.¼ | 40 ac. NW.¼ SW.¼ | 13 ac. SW.¼ SE.¼ | |

The land of the claimants in the other sections in the townships mentioned will be awarded a full water right for the number of acres as tabulated or listed by the water board.

The second question relates to the allowance made by the court of a half water right to some of the lands to which we have already referred. This allowance of a full water right, in lieu of the half water right allowed by the court, is subject to the conditions hereinafter made as to the use of the water until a complete application thereof is made.

The third objection is as to the priorities granted. This question is governed by much the same conditions we have referred to in relation to the School Teacher's ditch. The irrigation of this body of land is connected or mingled with the drainage thereof. It is extremely difficult to ascertain from the record when the reclamation of the land by drainage may be said to have ceased and the irrigation of the same commenced. It is also difficult to select the part they have reclaimed by drainage and the part which may have been arid before the irrigation thereof. The Cronin ditch, which was built in 1898, was for "the purpose of carrying the water away in the fall of the year." It was carried from where the channel gave out, or where the water spread over the land down to where the main channel reformed in order to prevent the water from spreading over the land.

The dates of priority awarded by the trial court are affirmed.

Much of the testimony that we have referred to, and a great deal more that we have read relating to the claim under the name of the Cronin ditch, applies with equal force as to the acreage to the lands in the following claims:

CROWLEY DAM AND BLACK SLOUGH.

Section 24, Tp. 25 S., R. 32 E., W. M.

The main controversy in regard to the award made by the Circuit Court to the Pacific Livestock Com-

pany for land in this section pertains to a one-half
water right. In some instances in the different
claims to which we have referred, the land is served
by water from two different systems, and on this
account, perhaps, there is a difference in the survey
made by the State Engineer and the engineer of
claimant. There is no question raised by the ap-
pellant as to the date of priority for this land. The
testimony supports the findings made by the water
board. In this Section 24, the court awarded water
for more acreage than found by the engineer of claim-
ant. The water board made an award for 412 acres,
which was less than the number shown on the map
of the State Engineer and less than the number of
acres awarded by the Circuit Court. The award
made by the water board, as tabulated in its findings
of fact and order of determination, will be approved
with a full water right with a date of priority, de-
scription, dams, ditches and streams as specified in
the order of determination on page 77.

Fred Otley and several other claimants assign
error in the award of the dates of priority of the
Pacific Livestock Company for lands classified under
the heads of Boat Ford dam and slough and Square
Well slough, both awarded a date of 1886, and Black
slough a date of 1887. After a careful re-examina-
tion of the testimony, as to the dates of priority for
these lands, we find no reason for making a change
in the dates of priority awarded by the Circuit Court.

In the tabulation of lands in Sections 28, 33, Tp.
24 S., R. 32 E., W. M., and Sections 4 and 9 in Tp.
25 S., R. 32 E., W. M., there is a difference of about
147 acres in the award made by the Circuit Court
and that made by the water board, the latter being
the larger. The court awarded a number of acres a
one-half water right. As we have already men-

tioned, ascertaining the number of acres is a matter of engineering. In these sections there is but little substantial difference between the number of acres shown on the map of the State Engineer and the number of acres of irrigated land shown on the map of the engineer of claimant, on which in some instances the figures are less than those of the State Engineer. The decree of the Circuit Court will be modified so as to award the Pacific Livestock Company a full water right for 1,226.5 acres as listed and tabulated by the water board on page 77 of the order of determination.

### HAYES DAM.

Sections 21 and 27, Tp. 24 S., R. 32 E., W. M.

The appellant claims 34 acres of irrigated land in Section 27, in addition to the award, and 55 acres in that section have been awarded only a one-half water right. In these two sections the water board approved a survey as made by Mr. Griffing and shown on the claimant's map. The claimant, Pacific Livestock Company, will be awarded 211.5 acres with a full water right and date of priority as listed in the order of determination of the water board at page 78. No question of priority is involved in this appeal.

### SLOUGH IN CENTER OF SECTION 34, TP. 24 S., R. 32 E., W. M.

This class of land is tabulated on page 80 of the decree of the court. A similar question is involved in regard to this land as in the last two claims mentioned. The award for Section 34 and Section 3, Tp. 24 S., R. 32 E., W. M., which comprises this class of land, will be for 737 acres as tabulated on

page 78 of the order of determination of the water board with a full water right.

In the award for land in Section 3, the State Engineer and the engineer of the claimant differed only five acres in respect to the irrigated acreage. In respect to Section 34, the State Engineer, the engineer of claimant, the water board and the Circuit Court substantially agreed as to the acreage.

### Dam in Section 35, Tp. 24 S., R. 32 E., W. M.

The computation shows 23.5 acres on page 81 of the decree. The water board awarded 58 acres. The decree of the Circuit Court will be modified so as to award the Pacific Livestock Company a water right for 58 acres in this section as listed or tabulated in the order of determination of the water board at page 78.

### Square Well Slough and Slough Through SW. ¼, Section 35, Tp. 24 S., R. 32 E.

The main question upon this appeal is in regard to a half water right awarded by the court for 68 acres. The award for this class of land, which is embraced in Sections 2 and 10, Tp. 25 S., R. 32 E., W. M., will be for a full water right for 1,112 acres, as listed in the order of determination of the water board at page 78.

### Black Slough.

All of this class of land is in Tp. 25 S., R. 32 E., W. M., in Sections 1, 11 and 12. (See pages 81 and 82 of the Decree of the Court.)

The appeal is as to the awards under this claim involved first, the reduction in the acreage; second, the allowance of certain lands of only one half a water right; third, the fact that the court changed

the priority of 1885 awarded appellant by the water board to 1887. There is no substantial question as to the area upon this appeal; the number of acres in Section 1 being increased 8.5 above the number claimed as shown on claimant's maps, the number of acres in Section 11 reduced 10 acres. In these two sections a half water right was awarded a few acres. In Section 12 the award was for the full 640 acres. Full acreage is claimed for Section 13 and the same is shown to be irrigated by the State Engineer's map and was awarded a water right by the water board. The court reduced the acreage and awarded a one-half water right to a large area of land. The same conditions prevail as to Section 14. There is no exception taken as to Section 15. Some of the land in this section is under the Cronin ditch and is so listed. There is no objection to the acreage awarded for the five subdivisions in Section 23, a part of which is under the Cronin ditch and is not included in this award. The surveys of the number of acres in this body of land made by the State Engineer and the other civil engineer are substantially the same. The record warrants awarding a full right for 3,586.5 acres of this class of land as tabulated and listed by the water board at pages 78 and 79 of the findings of fact and order of determination.

18. In regard to the question of awarding a full water right to the land where only a partial application of water to a beneficial use has been made, we follow the general rule that where an appropriation and diversion of water has been made and the water partially applied, either to a part of the land intended to be irrigated at the time the appropriation is made, or where a partial application has been made to all

of the land embraced, or intended to be embraced, in the appropriation, the appropriator is entitled to a reasonable time in which by due diligence he can make a complete application of the water to a beneficial use. It is not the custom nor is it expected that one making an appropriation of water for the irrigation of land will put all of the land in cultivation or irrigate the land completely at one time. The law sanctions the application of the water to a beneficial use within a reasonable time, the party being required to use due diligence, according to the circumstances and difficulties to be encountered: See *In re Hood River, supra,* and cases there cited.

In lieu of the provisions made by the learned circuit judge in awarding a one-half water right for lands in this proceeding, each of the parties having land for which a water right has been awarded to which the water has not been applied completely to a beneficial use should be allowed five years from the date of the entry of the mandate herein in the Circuit Court, or such further time as may be allowed by the State Engineer to place the lands in cultivation, construct lateral ditches or other artificial works for the purpose of making an economical and complete application of the water to the lands. When the water is not wholly used for irrigation of the land to which it has been awarded, and the same can be estimated or determined with reasonable convenience, the water-master should allow a diversion of only a sufficient amount of water to irrigate the land which is ready to receive it, or the amount to be actually used upon the land to which the water is awarded. In connection with one class of the lands, the Boat Ford slough lands counsel for claimant making a comparison, refers to the award made for adjoining land

in Section 28, Tp. 24 S., R. 32 E., W. M., of Marcellus B. Hayes, which land is said to be of the same character and affected by the same or similar sloughs or streams as the land of claimant, Pacific Livestock Company. This comparison is made in relation to the one-half water right awarded by the court. We notice in this connection that the Hayes award was given an early date of priority of 1886 for 387 acres of land and a later date of 1900 for 310 acres, much the same as appellant Pacific Livestock Company's award of dates.

Naturally, some of the land, before it would be ready to receive the water, would require leveling or smoothing. Where this can be done with a reasonable amount of labor, and an appropriation has been made for the particular tract of land, the law does not presume that it was the intention of the appropriator to leave the small places which are a little too high to irrigate fully without leveling the land or constructing artificial works and thereby made patchwork of fields, meadows and pastures. We, therefore, allow a full water right with the restrictions above and hereinafter mentioned in lieu of the one-half water right awarded by the trial court. The same principle applies to the whole question of acreage to be irrigated.

The date of relative priority for this class of land is a more difficult problem. As we have already noted, the dates are not so material if they have a proper relation and are equitably arranged. When provisions are made for a complete appropriation of the water, and systems of artificial irrigation works are installed so as to make a reasonably economical use of the water and there is plenty of water for all the land, then of course the dates become unimportant.

After careful consideration, the dates of priority for this class of land are affirmed.

## WILLIAM HANLEY COMPANY LANDS.

Several claimants, joining in the brief with Fred Otley, assign error of the court in awarding the William Hanley Company a right from either Foley Slough, East Fork or West Fork of Silvies River for lands with a date of priority of 1886.

Considering the stipulations of the various parties and the federal decree with a view of ascertaining how the several parties agreed at that time in regard to their respective rights to use the water of Silvies River, its branches and sloughs, for the purpose of irrigation and domestic purposes, and watering livestock, and noticing first the provisions relating to W. D. Hanley, it appears that it was stipulated and decreed that W. D. Hanley and his successors and assigns might maintain his dam in the East Fork of Silvies River in Section 21, Tp. 23 S., R. 31 E., W. M., and maintain his two ditches leading therefrom, one on the east side of the East Fork of Silvies River and one on the west side thereof "as the same are now constructed and built from the fifth day of May each year until the first day of July each year." And divert and use so much of the waters of said Silvies River during that time as should be necessary to irrigate Sections 27, 35, 21, 23, and 25, the N. ½ of Section 22, the N. ½ of the S. ½ of Section 22 and the S. ½ of the SE. ¼ of Section 22 and the W. ½ of Section 26, all in Tp. 23 S., R. 31 E., W. M.

The federal decree also recognizes the right of W. D. Hanley et al. to the use and enjoyment of the natural overflow of the river and of the water that would naturally run through his two ditches at any

time when his dam, above described, is open.   This could be done, as we understand the federal decree, although the water in the East Fork of Silvies River might be at such a stage that the use of the water, as stipulated by the Pacific Livestock Company and W. D. Hanley, and as stipulated by the Pacific Livestock Company and the other defendants, would leave practically none in the river for the use of the Pacific Livestock Company during the period mentioned.   In other words, the stipulation recognizes the right of W. D. Hanley and the other various parties stipulating with the Pacific Livestock Company, during the period from about the fifth day of May to about the first day of July of each year as superior to the right of the Pacific Livestock Company.   It seems that the period between the two dates named was considered as the main part of the irrigation season. The Pacific Livestock Company was considered as having a superior right, to a certain extent, during the other portion of the season.

After the entry of the federal decree, W. D. Hanley conveyed the lands of his, described in the decree, to the Wm. Hanley Company, which is now his successor in interest.   Therefore, the relative dates of priority of several of the claimants interested in this proceeding do not entirely depend upon the evidence outside of the record of the federal decree, but are, to say the least, influenced or governed to a certain extent by the solemn agreement between the parties themselves, which was thereafter embraced in the federal decree. In this connection the appellant Pacific Livestock Company contends that the court erred in awarding a date of priority of 1886 to a large area of land of William Hanley Company in Harney Valley, which

lands in the main, lie above the holdings of the Pacific Livestock Company.

19. On June 28, 1918, the William Hanley Company filed in the Circuit Court amended exceptions in which it claimed an earlier date of priority for certain of its lands than awarded it by the water board. After nearly all the testimony had been taken, but before the proceeding was referred by the court to the water board for the taking of further testimony, the William Hanley Company, on September 23, 1920, filed an amended claim setting forth earlier dates of priority than those in its original "statements and proofs of claims" for a large quantity of land. Certain proof with reference thereto was thereafter taken. This was done over the protest and objection of appellant Pacific Livestock Company. Notice of the "amended statement and proof of claim" was served upon the appellant Pacific Livestock Company and some twenty-five other claimants, but was not served upon all of the water users of Silvies River.

20. The opinion of *Hough* v. *Porter,* 51 Or. 318 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728), which has been a guide for several years, plainly indicates that a strict rule of pleading will not be invoked in suits in equity involving water rights. The suit in which that opinion was rendered was instituted prior to the enactment of the present Water Code, and it would seem that a stricter rule would prevail in regard to pleadings in a suit of that nature than would be invoked in presenting statements and proof of claims in an adjudication under the provisions of the Water Code. A liberal rule should be adopted in permitting such amendments. The court had jurisdiction of the whole matter by virtue of a compliance with the statutory requirements in regard to serving notices

upon the water users upon the Silvies River and its tributaries, which is analogous to the serving of a summons in an ordinary action or suit; and the amendments in question did not involve a jurisdictional question. It is apparent from the record that the Pacific Livestock Company in urging the invalidity of the amendment made by another claimant, is also suggesting a criticism upon its own procedure, from which procedure it obtained a very substantial benefit.

The parties or claimants had an opportunity to introduce proof relating to the amendments made. Considerable testimony was taken after such amendments. All, or nearly all, of the water users were represented in court by their attorneys. If a claimant had conceived that his rights had been prejudiced by virtue of the allowance of the amendments and had made an application to be heard in objection thereto or had desired to offer further proof affecting the amendments as pertaining to his rights, then under such circumstances, a different question would be presented to us for consideration. Under all the circumstances, as shown by the record, the amendment of the claim of Wm. Hanley Company should be allowed.

The Pacific Livestock Company also filed an amended claim embracing several hundred acres of land not included in its original claim and was awarded a water right for a large acreage of land comprised in the increase. The amended claim of the Pacific Livestock Company was not served upon the other claimants. The amendments in the present proceedings were influenced by the following:

It appears that the water board, in the trial of this proceeding, adopted as a general rule the granting of a priority based upon the first use of land that was

naturally overflowed. During the progress of the proceedings, this court rendered an opinion *In re Willow Creek,* 74 Or. 592 (144 Pac. 505, 146 Pac. 475); 25 R. C. L. 1004. In that case one claimant was the owner of a large body of, and filed its claim for, certain lands, by virtue of an appropriation, and other lands by virtue of riparian ownership, and also a claim for 292.02 acres on lower Willow Creek, where the channel of the stream disappeared and which area naturally overflowed during the freshet period.

In that case it was said:

"The overflow of these lands is analogous to a crude manner of irrigation much the same as the method adopted by other irrigators on this stream system at an early day, when they cut ditches and allowed the water to flow into the sloughs and low places and subirrigate their lands. It is unimportant how difficult or with what ease water can be appropriated for irrigation. It is tantamount to a beneficial use and is a valuable right which should not be ignored. The methods relied upon by the Eastern Oregon Land Company in the use of water, as well as similar use made by other irrigators in former years, is wasteful. It is often permitted as a privilege and not as a right, while it can be exercised without injury to anyone."

Subject to certain provisions the Eastern Oregon Land Company was awarded a water right for the 292.02 acres. With an early date of priority of 1867 subject to certain rights, since acquired by adverse user and the like, antagonistic thereto, this right was left indefinite for the reason the record did not clearly disclose what rights had been acquired by adverse user and the like.

In the case of *Eastern Oregon Land Co.* v. *Willow River Land & Irr. Co.,* 201 Fed. 203 (119 C. C. A.

437), a similar question was before the federal court, and we think the case involved the identical 292.02 acres.   The following language of the opinion, found on page 215, indicates the findings of the court:

"We are of the opinion, therefore, that the complainant has a prior right in the natural flow of the creek to the extent of its accustomed beneficial use of the water upon this land, and we find that this prior right is not only a vested right under the law, but that it is practically conceded by the admissions contained in defendant's answer in this action."

As bearing upon another feature of the present case, after referring to the Water Code of Oregon, L. O. L., §§ 6594 to 6672, as providing a system for the regulation, control, distribution, use, and right to the use of water and for the determination of existing rights thereto within the State of Oregon the federal court recognizes and practically invokes the exercise of our Water Code, and adjudication like the present proceedings, by the following order found at page 218 of the report:

"The decree of the court below is reversed, and the cause remanded for further proceedings not inconsistent with this opinion, and subject to such proceedings as may be had by the state board of control within its jurisdiction with respect to the rights of the parties herein to the waters of Willow creek."

In *McCall* v. *Porter,* 42 Or. 49, 55 (70 Pac. 822, 71 Pac. 976), Mr. Justice R. S. BEAN said:

"If land be rendered productive by the natural overflow of the water thereon, without the aid of any appliances whatever, the cultivation of such land by means of the water so naturally moistening the same, is a sufficient appropriation of such water, or so much thereof as is reasonably necessary for such use."

See, also, *Cascade T. Co.* v. *Empire Co.,* 181 Fed. 1011; *Thomas* v. *Giraud,* 6 Colo. 530, 533; *Larimer County R. Co.* v. *People,* 8 Colo. 614 (9 Pac. 794).

In *Utt* v. *Frey,* 106 Cal. 392, 396 (39 Pac. 807), concerning such an appropriation, the court said:

"If nature * * has furnished the medium of appropriation he may avail himself of the gift."

When Wm. D. Hanley testified in regard to the first construction of artificial works for the purpose of irrigating the land, for which his company now claims a water right, he testified upon the information gained from others, giving the date of the construction of a dam in the river in 1888.

Wm. D. Hanley and his brother, E. B. Hanley, were partners in business, running cattle in Rogue River Valley, southern Oregon. From 1879 to 1883 they drove cattle from southern Oregon to Harney Valley, and W. D. Hanley was there in Harney Valley a portion of the time until 1883, when he returned to southern Oregon where he remained until 1893, except for occasional visits to Harney Valley; so that he was not in Harney Valley during the first few years of the irrigation period. E. B. Hanley, the brother, came to Harney Valley in 1880. He first settled upon land in Section 21, Tp. 23 S., R. 31 E., W. M., in 1883. The land was flat or level and was overflowed from the river and from Whiting or Foley's Slough, and in 1884 they cut about 600 tons of hay. In 1885 they cut about 2,500 tons and sold "something like 1,500 or 1,700 tons to Todhunter & Devine, who were big land and cattle owners of the country at that time." From this sale of hay and from the other testimony, we take it that Todhunter & Devine were paying special attention to the raising of stock, and not so

much attention in proportion to farming as the Hanleys did during the early days. At that time there were no fences in the country and the stock were herded off of the hay lands. In 1885 the Hanleys dammed the slough that runs through the School section into Section 21 and also Whiting Slough (Foley Slough) and constructed small ditches and spread the water over the land. These dams were temporary in construction and accounts for the witness dating the construction of the dam in 1888.

He testified on rehearing, after the court had referred the case for the taking of further testimony pursuant to the statute. In 1886 they did fencing and constructed more dams and ditches and enlarged the dams until 1887 or 1888. The land was surveyed by the government in 1883 and E. B. Hanley filed his pre-emption claim in 1884, soon after the land was open to settlement. In 1886 they constructed a ditch six to eight feet wide from the river in Section 21, across a portion of Sections 21 and 23, Tp. 23 S., R. 31 E., W. M., as far as Foley's slough, and built a dam in the slough. In 1887 they put in the first permanent dam. The Hanleys purchased some of the land from other settlers who settled on the land soon after the date of E. B. Hanley's settlement and purchased some of it from the wagon road company. The Hanleys endeavored to obtain title to some of the land as swamp-land about 1885 and occupied the same as such. Afterward they purchased the land from the road company. E. B. Hanley, in his testimony, gave the details of the early settlement of the other portions of the land. The testimony shows that the Hanleys made a beneficial use of the water of Silvies River for the irrigation of large tracts of land before 1886.

115 Or.—7

The dates of relative priority awarded by the court to the William Hanley Company are affirmed.

HARNEY VALLEY DAM, DITCH AND IRRIGATION COMPANY.

21. The appellant, Pacific Livestock Company, assigns error in awarding the claimants who are water users from the Harney Valley dam, Ditch & Irrigation Company ditch a priority of 1886, instead of 1888, for 1,513.13 acres of land. As we understand the brief of the learned counsel for this appellant, the only question raised involves the doctrine of relation. It appears from the record that in the fall of 1886 three men, T. A. McKinnon, Sam King and A. J. Wilson, contemplated an organization of the company, and that these men posted a notice of appropriation of water at the point of the proposed diversion in the fall of 1886, and during the same season did some work of plowing and scraping and commenced the construction of a dam. In 1887 the company was organized as a corporation under the laws of the State of Oregon. It was organized for the purpose of irrigation and power. The original incorporators were T. A. McKinnon, Sam King and A. J. Wilson. The parties interested in the creation of the corporation were men who had land in the vicinity of where the corporation was to construct the ditch for irrigation purposes. It was for the purpose of enabling the various owners of land to have a system that would serve all of them. The first work done by the company itself was in the fall of 1887. One ditch was built on the west side in 1889 and another which leads from a point in the southeast of the southwest quarter of Section 23, southeasterly to the southeast quarter of Section 26, was constructed in 1890. It is asserted by the irrigation company that the corporation owns

the system for the benefit of its stockholders, naming them, and that each of them "has filed or are filing separate claims thereto, referring to this claim for the details of appropriation and use, they being the users of the water and owners of the land irrigated therewith." The proceedings were all a part of the same transaction and done for the purpose of obtaining one result: See 3 Farnham on Water Rights, 2060, § 666. The corporation was the mere agent of the water users for the purpose of serving their several interests: *Hildreth* v. *Montecito*, 139 Cal. 22, 29 (72 Pac. 395); *Oregon Const. Co.* v. *Allen Ditch Co.*, 41 Or. 209 (69 Pac. 455, 93 Am. St. Rep. 701).

22. It is objected by appellant that the incorporators signed the notice of appropriation, and that the corporation did not. In the "statement and proof" of claim of the company, it is stated the stockholders of the corporation, naming them, respectively own and irrigate land with the water claimed for them by the company and that "the corporation holds the legal title to the waters and system aforesaid, in trust for its stockholders," but each stockholder holds his land in severalty and the appurtenant right to the use of the necessary amount of water appropriated, as well as the irrigating system, and "it will appear that the water and system is owned by the stockholders in the name of Harney Valley Dam, Ditch & Irrigation Company, and that the right to the use and maintenance of it is appurtenant to each respective tract of land; and that such rights date back to the initiation of the said appropriation and that the waters have been used thereon for irrigation ever since." Here follows a list of stockholders and water users and the number of acres of their respective lands. Each of the stockholders of the corporation and water users

from the Harney Valley Dam, Ditch & Irrigation Company ditch filed separate and individual claims to the water conveyed by the company ditch to their respective lands, referring to the claim of the company and stating that they are each stockholders in the corporation.

The water board in its findings of fact and order of determination, and the Circuit Court in its findings of fact and decree, in tabulating the water rights listed the same under the name of the Harney Valley Dam, Ditch & Irrigation Company, a corporation, describing each separate body of land as owned by the respective stockholders. The objection made by the appellant is one of form and not of substance. It should be remembered that this appropriation was initiated and consummated prior to the enactment of our present Water Code and before the enactment of the Water Law of 1891, at the time when the statute of this state did not prescribe the kind of notice of appropriation and appropriators of water usually followed the custom of miners in proceedings of this nature, which was recognized by the courts.

As to the real owner of water rights and ditch rights, even after the enactment of the Water Code, Mr. Justice BENNETT in the case of *Eldridge* v. *Mill Ditch Co.*, 90 Or. 590, 596 (177 Pac. 939), a case which involved a mutual water company, organized under the General Corporation Laws, where it appeared that the corporation did not sell water but merely carried it, declared the law in the following language:

"It seems to be pretty well settled in the states having Water Codes similar to that of our own state, even in cases of public service corporations organized for profit and selling water to the general public, that the water and ditch rights really belong to the individual appropriator and are appurtenant to the lands

upon which the same are used, and that the corporation transmitting the same is in the nature of a holding company or agent for the true owners of the water rights.''

The same principle is enunciated by Mr. Justice BURNETT in *In Re Grande Ronde River*, 113 Or. 211 (232 Pac. 626), and we think it is applicable to the present question.   We quote from the opinion as follows:

''There were other appropriators using water from the same river, and, for the purpose of the better and more efficient enjoyment of their appropriations, they formed a company to maintain a ditch and deliver to them the water of their several appropriations. * * it was an instrumentality whereby the appropriators used and enjoyed their appropriations. * *

''The evidence is plain that, in the origin of affairs in that country, Gekeler's and Grout's predecessors appropriated water, and that the pseudo corporation first devised, and the Irrigation Canal Company were instrumentalities fashioned for the enjoyment of those appropriations.   So far as that is concerned, the appropriators might have employed men to haul the appropriated water to their lands in water wagons; they might have dug a ditch and discarded it and in its place installed a water-tight pipe line, or, as they did, they might have formed a corporation to serve the same purpose.''

23. In the enactment of the statutes, governing the method of the appropriation of water, the pre-existing law is substantially declared.   Before the Code, notice was a requisite, but it did not have to be written notice, nor, consequently, did it have to express the present required details.   Acts such as would put a man on inquiry, some unequivocal outward acts, such as making a preliminary survey, as declared in 1 Wiel on Water Rights (3 ed.), 344,

§ 269, were notice enough. It was the custom, however, to post a written notice even before the Code.

In regard to a form of a notice of appropriation before the statute and under the early statutes, it is stated in 2 Kinney on Irrigation (2 ed.), § 711, thus:

"All that was considered necessary was that the terms of the notice should be sufficient to put a reasonably prudent man upon inquiry as to the rights claimed by the party posting it. Such notices were admissible in evidence, should there be litigation over the water right claimed under them, and were liberally construed in favor of the party claiming rights under them."

24. The notice here under consideration was sufficient to inform a subsequent appropriator of the locality intended for the diversion of the water, the name of the stream from which the appropriation was to be made, the amount of water claimed to be appropriated and the purpose of the appropriation. The corporation was not then in existence. The notice was signed by three of the intending incorporators. In the absence of any statutory requirement, as to such a notice of appropriation we think the notice posted, filed and recorded was sufficient. The real parties in interest and owners of the water rights and ditch rights are the various water users of water from the ditch of the company who are also stockholders of the corporation: *O'Neil* v. *Twohy Bros.*, 98 Or. 481 (190 Pac. 306). It would seem to be immaterial at what stage of the proceedings the water users, or real appropriators, employed or organized a corporation as an instrumentality in constructing a ditch as a means of conveying to their lands the water which they were in this manner attempting to appropriate, and to which they afterward secured a

complete right.  A court of equity will look beyond
the form of the proceeding and if possible consider
the substance of the right.

All parties were warned of the appropriations and
put upon inquiry by the notice posted.  The construc-
tion of the ditch having followed within a reasonable
time and the water having been applied to a beneficial
use with due diligence and in a time within reason,
the right relates back to its inception at the date of
the posting of the notice.

The decree of the Circuit Court, fixing the date
of priority for the various tracts of land of the claim-
ants using water from the Harney Valley Dam, Ditch
& Irrigation Company ditch as 1886, is affirmed.

### Lena B. and Mary Harkey Claims.

Lena B. Harkey was awarded a water right for
the southwest quarter of Section 6, Tp. 23 S., R. 31
E., W. M., with a date of priority of 1886.  The Pa-
cific Livestock Company, the appellant, assigns error
claiming the date should be 1910.  Mary J. Harkey
was awarded a right of 160 acres in Section 6, Tp. 23
S., R. 31 E., W. M.  Error is assigned in making a
date of priority of 1886 instead of 1888.  The land
of Lena B. Harkey was formerly owned by George
Stanclift.  It was irrigated from the old Stenger dam
built in 1885, which was afterward washed out.  The
Sweek dam was afterward built in 1907 and replaced
in 1910.

The Mary J. Harkey land is irrigated from the
present Harkey-Dixon ditch.  Part of this tract and
the Lena B. Harkey tract are subirrigated from the
back waters caused by the Sweek dam.  The appellant
asserts that Lena B. Harkey did not own an interest
in the Stenger dam.  In 1910 Mr. Sweek made an

agreement with Mary J. Harkey and George Stanclift, predecessor of Lena B. Harkey, whereby all the parties were granted an interest in common in the dam. The testimony shows that the land was subirrigated by the back waters of the Stenger dam for about 12 years.

The title to the dam seems to be the only question raised. This land was irrigated in about the same manner as the land of other claimants. For the reason stated, in regard to various other claims, the award of the date of priority of 1886 to Lena B. Harkey and Mary J. Harkey is affirmed.

### Harney Valley Improvement Company.

The appellant assigns error in awarding the Harney Valley Improvement Company a priority of 1887 for 320 acres of land in Section 15, Tp. 23 S., R. 31 E., W. M., instead of a priority of 1890.

It appears from the testimony of William D. Hanley, president of the claimant company, that this company obtained title to the land about 1908; that the land was originally irrigated by means of overflow from Foley's slough. In recent years ditches were constructed on the north line, the east line and the west line. The land is under contract to the McLaren brothers. There are two branches of Foley slough which run through the land and join near the center of Section 15 where the slough commences to raise to the top of the ground. A pioneer diversion had been made there in 1893 when Mr. Hanley returned to that part of the country. There was a squatter on the place until some time in the nineties. The land was fenced in the latter part of the eighties or the first part of the nineties. The testimony is rather indefinite.

It appears that the date of relative priority for this land should be changed from 1887 to 1890. It is so ordered.

25. The right of a person claiming an appropriation of water cannot be tacked on to that of a mere squatter who, while he may have irrigated the land, has abandoned it and has not transferred his interest in the land or irrigation works to the claimant or his predecessors: *Low* v. *Schaffer,* 24 Or. 239 (33 Pac. 678); *Hough* v. *Porter,* 51 Or. 318, 421 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728).

Error is also assigned in awarding the Harney Valley Improvement Company a priority of 1883 for 640 acres in Section 19, Tp. 23 S., R. 31 E., W. M., instead of a priority of 1886. It appears that this land was leased by a settler from the Willamette Valley and Cascade Mountain Wagon Road Company in 1883. At first it was irrigated by overflow from the river and a little later by means of dams, ditches and subirrigation. The section consists of meadowland and has been cropped and irrigated ever since 1883. The award of the date of priority of 1883 for this section is therefore affirmed.

## HULL HOTCHKISS CLAIM.

26, 27. The appellant, Pacific Livestock Company assigns errors—(1) In awarding Hull Hotchkiss a priority of 1886 for 150 acres of land in Section 30, Tp. 23 S., R. 31 E., W. M., instead of a priority of 1887 and a priority of 1886 for 160 acres of land in Section 32, Tp. 23 S., R. 31 E., W. M., instead of a priority of 1888. (2) In awarding this claimant a priority of 1886 instead of 1889 for 130 acres of land in Section 32, Tp. 23 S., R. 31 E., W. M. The errors are claimed for the reason that Hotchkiss failed to file exceptions

to the findings of the water board as to the date of his priority which the court changed. Neither the assignments of error nor the brief of appellant specifies or suggests that the finding of the trial court is wrong, or that the difference in dates awarded and the dates suggested by appellant is material. Those matters are left for speculation or for an examination of a very voluminous record. The only thing complained of is that the court arrived at its conclusion in an erroneous manner. It is not every error that will be examined by an appellate court, but only prejudicial errors which are pointed out with reasonable certainty. Section 5745, Or. L., prescribes the method of procedure in proceedings of this kind. Under the provisions of that section a claimant, in order to obtain a more favorable date of priority than awarded by the water board, should file exceptions thereto in the Circuit Court. For some reason, presumably in order to make the decree workable and uniform, the trial court considered the exceptions as filed and changed the dates of priority awarded to Hotchkiss. Section 5745 of our Code is to a certain extent directory. The strict rule invoked in regard to pleadings in a regular suit in equity should not be strictly adhered to when an assignment of error is considered upon an appeal in the matter of adjudication of water rights upon a stream system. More than fifteen years ago this court, in the case of *Hough v. Porter, supra,* at page 439 of the report, held, in effect, that the water suits are, in a sense, *sui generis.* Complications and many intricacies developed by litigation of this character necessarily give rise to new questions of practice. A stricter rule should be invoked upon an appeal in a case of this kind than

upon the original hearing in the trial court.   Appellant complains that the pleadings of Hotchkiss in the trial court although not forming a jurisdictional question were defective.   It might be said that the assignments of error of the appellant, in regard to this matter, are not perfect.   We decline to examine the assignments of error.   The award of the dates of priority of Hull Hotchkiss is affirmed.   Hull Hotchkiss alleges error in the reduction in the number of acres allowed by the water board as irrigated land. There appears to have been but little controversy in regard to the acreage.   The difference seems to be of 39.29 acres in the award of land in Section 30, and Section 32, Tp. 23 S., R: 31 E., W. M.   The map of the State Engineer shows that the land of Hotchkiss in the two sections mentioned is irrigated.   Mr. Hotchkiss lives on Section 30 and states that he owns the lands described in the other section.

The evidence warrants the allowance made by the water board and the award is modified accordingly.

## PACIFIC LIVESTOCK COMPANY, CONTESTANT, *v.* JENNIE JONES, CONTESTEE.

Jennie Jones filed her statement and proof of claim, claiming a water right for the NE. ¼, and the NE. ¼ of NW. ¼ and lots 6 and 7 of Section 17, Tp. 23 S., R. 31 E., W. M., claiming a right to the waters of Silvies River for irrigation and stock purposes, the initiation of which was in the spring of 1883.   She asserts, in substance, in a supplemental statement, that the lands were actually irrigated from time immemorial by the annual overflow of Silvies River and its sloughs; that in the spring of 1883 her lands were irrigated to produce the first crop which was beneficially used; that the natural overflow was deemed suf-

ficient for the irrigation of the lands until 1890, when there was a water shortage and claimant's predecessor in interest Milo Cushing, with others, constructed a dam in the river, known as the Newman dam, to divert the water for the land, as detailed.

The Pacific Livestock Company at the proper time filed a notice of contest, the gist of which, omitting the formal part and legal statement is, in effect, as follows:

The Pacific Livestock hereby contests the proof and claim filed in said matter by Jennie Jones on the following grounds: (1) "That the said claimant did not, at the time stated in said proof, appropriate any of the waters of Silvies River. (2) That the said claimant did not, at the time stated in said proof, appropriate the quantity of water by him claimed to have been appropriated. (3) That the said claimant never did appropriate, the water claimed by him to have been appropriated, or any part thereof." The contestant refers to the decree of the federal court above mentioned, and avers that whatever rights the said claimant may have in the said waters are subject to the rights of this contestant, as set forth in said decree.

The testimony was taken in the contest and shows that one W. F. Meglemire filed a declaratory statement May 30, 1884, for the NE. ¼ of said Section 17 and thereafter made final proof and obtained a patent for the land. The NE. ¼ of the NW. ¼ was selected July 17, 1884, by the Willamette Valley and Cascade Mountain Wagon Road Company and patented February 3, 1900; that the river runs on the west side of the land and two sloughs run through the land. The land has always been irrigated by the overflow of the river and some from Foley slough; that a

dam was constructed in the river in 1890 known as the Newman dam; that claimant now owns a one-third interest in the dam.   Frank Miller and Mrs. Clemens own the other interest.   This dam and the land of Milo Cushing described as the NE. ¼ of the NW. ¼ and lots 6 and 7 of Section 17, Tp. 23 S., R. 31 E., W. M., were mentioned in the federal decree and a stipulation entered into by the complainant, Pacific Livestock Company and Milo Cushing and others, stipulating in effect that Cushing and his successors in interest, might maintain the dam and irrigate the Cushing land, as well as to use the natural overflow of the river without obstruction for that purpose during the irrigating season of each year, and maintain their dams in said river as the same were then constructed so as to divert the water during the irrigating season of each year and use such waters so diverted for domestic purposes and for watering livestock and to irrigate during such irrigating season each year the land of Cushing described.   The decree was rendered in conformity to the stipulation.

As noted in the remarks above pertaining to the lands of the successor of Wm. D. Hanley, this stipulation, in effect, provides that Milo Cushing, predecessor in interest of Jennie Jones, claimant, was entitled to use the water of Silvies River and Foley slough during the irrigation season, which is estimated to be in accordance with the dates named in the federal decree, irrespective of the rights of the Pacific Livestock Company, at least during the irrigation season named in the decree.   It appears to have been contemplated by the parties to the stipulation that the right to use the water for the land described was superior to that of contestant Pacific Livestock Company.

It appears that the land has been irrigated by means of the dam mentioned and three or four ditches. There are a number of small sloughs north of the land which bring water on to the land. Milo Cushing lived on part of the land in an early day. At times there has been too much water on the land, which condition was corrected by diking. The land has been used for raising wild hay on the meadow, and alfalfa, and as a dairy ranch. It was fenced in 1888 when the witness Dave Newman first knew it. How long before that date the fence was constructed we do not find in the record. Mr. McGlemery, who formerly lived on the other portion of the land, has not been in that part of the country or heard from for several years and could not be obtained as a witness.

28. While the notice of the contest challenges the date of the initiation of the appropriation of the water by the claimant's predecessor in interest, it does not mention any specific date. The notice of the contest is in the same printed form, and in substance the same as all the other notices of contest filed by appellant. Section 5740, Or. L., directing, among other things, the hearing of contests and the taking of testimony, provides that the "evidence in such proceedings shall be confined to the subjects enumerated in the notice of contest. The burden of establishing his claim shall be upon the claimant whose claim is contested." Mrs. Jennie Jones did not testify upon the hearing of the contest. Apparently the pre-emptioner, Meglemire, according to her statement and proof, settled on the claim prior to the time of filing his declaratory statement for a portion of the land. There was no testimony on the part of the contestant

contradicting the statement and proof or the tesimony of the contestee, Mrs. Jennie Jones. Under these circumstances, although the burden of proof is upon the claimant, we think her statement and proof of claim should be considered with the other evidence. When the testimony is weighed in the light of the stipulation contained in the federal decree, we think that it authorizes the date of priority of 1883 as awarded by the trial court, which is affirmed.

## F. L. Mace Land.

The next assignment of error by appellant is as to the award to F. L. Mace of a priority of 1886 instead of a priority of 1887 for the lands in Sections 20, 17 and 28, Tp. 23 S., R. 31 E., W. M., and a priority of 1886 instead of 1888 for the lands in Sections 32 and 28, same township and range. In addition to the matter of filing exceptions considered in relation to the claim of Hotchkiss, appellant contends that the testimony does not support the priority of 1886. F. L. Mace was a party to the decree in the federal court and it was at that time stipulated by the Pacific Livestock Company and Mace that Mace could maintain a dam in the East Fork of Silvies River, where then constructed, on the NE. ¼ of Section 20, Tp. 23 S., R. 31 E., W. M., during the irrigation season and at no other time,

"the said irrigating season to begin after the spring flood each year and when the waters of the west fork of said river at the dam of H. C. Levens, one of the defendants in this suit, shall so recede that the surface of the water shall be two feet below the foot board on top of the structure of said dam, which foot board is six and 7/12 feet above the board bottom of said dam, and shall continue from said time until the 20th day of July each year; and the said defendant,

F. L. Mace, may retain the waters of said east fork of Silvies river during said irrigating season as above defined and divert and use so much thereof by means of his said dam and the ditch leading therefrom as shall be necessary to irrigate the east half of the northeast quarter and lots one and four of section 20 and the west half of section 28 all in township 23 north range 31 east, Willamette Meridian.''

The stipulation further provides that if during any year after the spring flood before the 15th of May the water of Silvies River did not recede to the point mentioned, then Mace might maintain his dam from the fifteenth day of May to the twentieth day of July for the purpose mentioned.    The stipulation also provided that Mace might enjoy the natural overflow of the water from the river.

It is shown by the evidence that Mace settled upon Section 20, Tp. 23 S., R. 31 E., W. M., in 1883 and has resided upon the land ever since. In those days there were practically no fences at the ''head of the island.''    Mace, however, fenced his land in 1885.    It appears that all of this land was naturally irrigated by the waters from Silvies River to quite an extent. At the commencement of the taking of the testimony in this proceeding it was stipulated between the counsel of the respective parties as follows:

''It is further understood and agreed that the testimony taken in any particular contest may be used in any other contest where the same is relevant and material to the same effect as if taken in those contests, and does avoid the taking of testimony of any party or witness more than once.''

It appears that F. L. Mace and others introduced their first testimony upon the theory that the date of priority should not commence until some direct work or act or artificial means of diversion was com-

menced; while the dates of priority of the Pacific Livestock Company had been given as the date of settlement and use. They, therefore, asked that the matter be again referred to the water board for the taking of additional testimony before a referee, which was ordered by the trial court. Mace thereafter introduced additional testimony. We believe the brief of appellant was prepared without the testimony given upon the rehearing being at hand. It appears that all of the Mace land is naturally irrigated from the waters of Silvies River. His early settlement in 1883, fencing the land in 1885, harvesting hay crops and the construction of a dam, all indicate that it was the intention of Mace to appropriate the water of Silvies River for the beneficial purpose of irrigating his lands in Sections 17, 20 and 28. The date of priority of 1886 for his lands in Sections 17, 20, 28 and 32 is approved and the decree in this regard is affirmed.

OREGON WESTERN COLONIZATION COMPANY AND OTHER CLAIMANTS.

The assignment of error as to the award of the date of priority to the Oregon Western Colonization Company of a date of priority of 1875 for 152.84 acres of land in the SW. 1/4 of Section 31, Tp. 22 S., R. 31 E., W. M., involves only one question in addition to those that have been passed upon in relation to other claims.

The property was settled upon by the Whitings in 1875 apparently in good faith, in an attempt to obtain title to the land. Mrs. Whiting later found it to be "road land." She did not abandon it, however, and about 1897 she and the road company compromised the matter and Mrs. Whiting obtained an estate in

the land by virtue of a lease from the road company. A portion of the land was fenced as early as 1885 and a dam was put in on the property in the slough and the land was improved and cultivated.

29, 30. A mere squatter upon public lands may acquire such an interest in the right of the possession thereof that he may even by parol transfer his rights therein to another, in which event the rights of the purchaser thereof, claiming under the doctrine of prior appropriation, relate back to the time of the original diversion: *Hough* v. *Porter,* 51 Or. 318 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728). In the instant matter Mrs. Whiting did not make any transfer of her interest during the time she was a mere squatter upon the land. The right of appropriation that she obtained as a squatter inured to her benefit after she obtained a lease of the land and also to the benefit of her grantee or successor in interest the present claimant. This award is affirmed.

The assignments of error in regard to the award to the Oregon Western Colonization Company; and the error claimed as to the award to the P. G. Smith and Julian Byrd (Specification of Error No. 67) for 160 acres in the SE. ¼ of Section 20, Tp. 23 S., R. 31 E., W. M., awarded a priority of 1884 which appellant claims should be 1887; and also Specification of Error No. 68 as to the award of C. J. Smith of a priority of 1886 for 160 acres in the SE. ¼ of Section 28, Tp. 23 S., R. 31 E., W. M., which the appellant asserts should be 1892; also the award of James Pirie (Specification of Error No. 69) of a priority of 1893 for 119.66 acres in Sections 2 and 3, Tp. 24 S., R. 31 E., W. M., which date the appellant claims should be 1883; also Specification No. 70 as to the award of Grant Sturtevant for 109.91 acres in Section 36, Tp. 22 S., R. 30 E.,

W. M., which was awarded a date of priority of 1886 and appellant claims the same should be made 1887; also the Specification of Error No. 76 in regard to the award of Thomas G. Howser for 158.24 acres of land in the NE. ¼ of Section 2, Tp. 24 S., R. 31 E., W. M., which was awarded a date of priority of 1883 and which date the appellant claims should be made 1886,—each involves the question of the effect of the natural irrigation of the land by the water from Silvies River which we have heretofore mentioned and passed upon several times. The awards of the several dates of priority are therefore affirmed.

### T. F. Matney Lands.

The Pacific Livestock Company alleges error in the award to T. F. Matney in regard to the date of priority of two tracts of land, one of which is 160 acres in Section 6, Tp. 24 S., R. 31 E., W. M., known as the Gerred place, the other tract is known as the Mothershead place (now said to be owned by S. F. Tyler), and contains 136 acres in Section 17, Tp. 23 S., R. 31 E., W. M. The company asks that the date of priority be fixed as 1889 instead of 1887.

As to the Mothershead place, George Sizemore testified that the land was irrigated from the West Fork of Silvies River; that a dam was constructed for that purpose in 1889, and about two years later another dam was built. There was a ditch running north out from the dam then on the south side below the dam. That the land was low enough there so that by cutting a ditch a couple of feet deep it would carry the water on the place; that the land is pretty level and watered from a low swale. The water spreads easily over the land. He thinks they cut hay

since 1887 on the Mothershead place; that the land was pretty wet in early years.

George Young testified substantially to the same effect, except that he stated that they cut a crop of wild hay on the land in 1890, and that he does not know whether or not any was cut prior to that time.

In regard to the Gerred place, Mr. Sizemore states that hay was cut thereon in 1886 and each season ever since; that this land was, practically all, well irrigated sufficiently for the raising of crops since he first knew it in 1886. He owned the Gerred place in 1888 and stated that there was a slough passing through the place; that there is a dam in the slough that has been there for many years. He thinks it was placed there in 1887. He constructed other dams and ditches to irrigate the place.

Young testified that he had been acquainted with the Gerred place since 1885; that there was a dam in the slough on the place and a dam in Chapman's slough on the Hudspeth place, just north of this land, that turned the water down on the Gerred place. This was put in by Hudspeth and one of the Gerreds in 1889. The first hay he knew of being cut on the land was in 1890 and that crops have been raised thereon regularly ever since.

It appears that before the People's ditch was dug the water ran down the slough or swale on Section 6. Mr. Sizemore appears to be better acquainted with the land, having owned a portion of it at the material date, than Mr. Young. Sizemore's testimony shows that the land has been irrigated ever since 1886. There is no contradiction of his testimony.

Under the rule prevailing in this case, in regard to the land naturally irrigated we see no reason for

changing the date of priority of the award made to Thomas F. Matney.

### Charles E. McPheeter's Claim.

. This claimant was awarded a date of relative priority of 1908 for the irrigation of 160 acres in the NW. ¼ of Section 33, Tp. 23 S., R. 32, W. M.   In the tabulation of the four subdivisions of this quarter-section, only fifty acres are listed which is alleged to be a clerical error, and which we are asked to correct. The correction will be made so that the description of the land or place of use of Charles McPheeter's award for 160 acres in this section will read as follows:

> 40 ac. NE. ¼ NW. ¼
> 40 ac. NW. ¼ NW. ¼
> 40 ac. SW. ¼ NW. ¼
> 40 ac. SE. ¼ NW. ¼
> Sec. 33, Tp. 23 S., R. 32 E., W. M.

### J. W. Biggs Claim.

In a petition to the water board for the taking of further testimony, it is stated, "J. W. Biggs has not offered the full testimony as to his date of priority." Error is alleged in the award of J. W. Biggs and it is claimed that a portion of the time embraced within the award is only supported by hearsay evidence. We find no testimony in regard to J. W. Biggs' claim taken upon rehearing or other testimony in the record, directly supporting the testimony of claimant which is alleged to be hearsay.   This claimant will be allowed to point out such testimony, if any there be in the record, and if the matter is an oversight, as we believe it is, the claimant will be allowed to produce further testimony before the State Engineer (formerly the water board) in the regular way, and the Circuit Court will be authorized to direct the same to be taken.

## C. H. LEONARD CLAIM.

Error is assigned in the finding that the lands of C. H. Leonard herein are not entitled to a full water right. As it is believed that a partial water right awarded by the trial court is sufficient for any of the lands described herein, and in order to preserve uniformity to a certain extent, all of the lands herein decreed by the trial court to be entitled to a partial water right will be awarded a full water right as defined herein, subject to the restrictions and qualifications herein mentioned.

C. H. Leonard also complains that the court allowed him a water right for only 180 acres and claims such right for 260 acres in Sections 9 and 10, Tp. 25 S., R. 32½ E., W. M. The testimony, in regard to this claim, in addition to the statement and proof of claim, is found in volume 3, page 507 et seq. of the testimony and shows that 260 acres of this land has been irrigated by the waters from the East Fork of Silvies River, most of it by means of the Jordon ditch and a portion by means of levees or dams. The map of the State Engineer shows that nearly all of this land has been irrigated and the remainder is explained by the testimony of the claimant as not having been covered by the map.

The decree of the court will be modified and C. H. Leonard will be awarded a water right for 260 acres in the sections named, as tabulated in the findings of fact and order of determination of the water board.

### SILVIES RIVER IRRIGATION COMPANY.

31. The Harney Basin Development Company assigns error of the court in finding that the Silvies River Irrigation Company commenced construction work in good faith, or at all; and in awarding it a

date of priority of October 17, 1907. The record contains the following testimony of an officer of the Silvies River Irrigation Company:

"The company was organized, organized in good faith, and a good deal of work was constructed in good faith; thousands of dollars were expended in surveys, and in legal expenses in connection with the organization of this company, a good many thousand dollars were spent in actual construction and by an injunction we were prevented from going any further, our hands have been tied, we are unable to go forward."

We find no contradiction of such testimony. The corporation was organized and filed notices of appropriation of water from Silvies River before the passage of the act of 1909, known as the Water Code, and construction of works appear to have been commenced in good faith before the enactment named. The rights of the company are governed by Section 5717, Or. L., amended by Chapter 283, Laws of 1923, page 439. This section directs that such a right shall be adjudicated as provided by the statute for this proceeding. Of course, a perfect appropriation of water by the company depends upon the future compliance with the statute. The point raised by the appeal is not well taken.

The Silvies River Irrigation Company asks for a change in finding No. 15 of the Circuit Court so as to give it a reasonable time in which to resume construction of its works, and a sufficient time thereafter in which to complete the appropriation by putting the water to a beneficial use. This project has been delayed by litigation and it cannot proceed until the rights involved herein are finally determined. The time allowed by the Circuit Court was January 1, 1925, for the commencement of actual construction of the work, and required that the appropria-

tions should be completed and the water put to a beneficial use by January 1, 1927. The Silvies River Irrigation Company will be allowed to apply to the Circuit Court to fix a new date for the commencement of the actual construction of its irrigation system; and also a new date when its appropriation shall be completed and the water put to a beneficial use. The Circuit Court may refer the matter to the State Engineer under Section 5717, Or. L., if deemed advisable.

We are constrained to make this provision for the reason, among others, that it appears that after the filing of the order of determination of the state water board in the Circuit Court in 1919, an irrigation district was organized including all the irrigated lands in Harney Valley. In passing upon the project of the Silvies River Irrigation Company, and the same may be true in regard to the Harney Basin Development Company, there is so much depends upon the future that the matters should be in such condition that they may be readily passed upon by the Circuit Court when the time arrives, as it is possible there may be a conflict of interests of these three corporations.

Finding No. 15 and the decree of the trial court will be modified accordingly. On account of an apparent clerical error, finding No. 15, page 16 of the decree of the trial court, will be amended by inserting in the description of the lands proposed to be irrigated by this company after the figures and letter "32½ E." and before the words "and sections," the following: "all of Tp. 24 S., R. 33 E., W. M.," in order that the last-described lands may be added to the lands described in said finding No. 15, which are proposed to be irrigated by Silvies River Irrigation Company.

This company applies to change the place of use of water according to the prayer of the amended statement and proof of claim filed before the water board March 10, 1921, and that the order of determination and decree of the trial court be changed as proposed by the amendment so as to describe additional lands proposed to be irrigated by this claimant in—

Section 16 Tp. 23 S. R. 31 E. W. M.
Section  4 Tp. 24 S. R. 31 E. W. M.
Section  6 Tp. 24 S. R. 32 E. W. M.
Section  7 Tp. 24 S. R. 32 E. W. M.
Section 24 Tp. 24 S. R. 31 E. W. M.
Section 16 Tp. 24 S. R. 31 E. W. M.
Section 14 Tp. 24 S. R. 31 E. W. M.
Section 13 Tp. 24 S. R. 31 E. W. M.
Section 12 Tp. 24 S. R. 31 E. W. M.

We assume, without deciding, that the rights of Silvies River Irrigating Company are in embryo, or inchoate, and that the rights have not yet become appurtenant to the lands proposed to be irrigated. The company should be allowed to apply to the State Engineer to make the change of the description of the land proposed to be irrigated, the same to be in lieu of Sections 35, 21, 19 and a portion of 17, Tp. 23 S., R. 33 E., W. M., which were eliminated by the claimant by a so-called relinquishment, such change in description to be made if sanctioned by the State Engineer; provided, further, however, that such change in the description of the land, or amendment, or the adding of the description of said sections, shall not affect any prior right decreed in this proceeding, but shall be subordinate and inferior to all such prior rights.

It is assigned by several claimants that the court erred in decreeing that

"a right to store water is a separate and distinct right from the right to use such water, and a water

right for irrigation does not give the water user entitled thereto, the right to store such water."

We deem it unnecessary, under the issues in this proceeding, for the decree to define the right mentioned separately from the right to use water. Therefore, that portion of the decree last quoted above will be eliminated from finding No. 27 of the decree of the trial court.

### Federal Decree.

The claimant, Pacific Livestock Company, by its counsel, introduced in evidence the record in the case of *Pacific Livestock Company* v. *W. D. Hanley et al.,* in the United States Circuit Court for the District of Oregon, including the pleadings, opinion of the court and the decree rendered on December 10, 1901, and also the testimony of witnesses given upon the hearing in that case in the federal court, which testimony was read into the record in this proceeding.

It appears that after considerable testimony had been taken in the case in the federal court a decree was entered on the stipulations of the parties. The decree recites the stipulations preliminary to the decree proper which was based thereon and also on the testimony and records one of the stipulations between the parties, which provides, among other things, the following:

"That the defendant W. D. Hanley has one dam in the east fork of Silvies River, constructed and built on and across said river in Section 21, Tp. 23 S. R. 31 E. W. M., and two ditches leading therefrom, one on either side of said east fork of Silvies River, and also has one ditch leading out of the east fork of Silvies River on the east side thereof and on the south half of section 27, in township 23 south, range 31 East Willamette Meridian,

and said defendant W. D. Hanley and the complainant have entered into a stipulation, which stipulation is in words and figures as follows, that is to say: * * ''

The decree as to W. D. Hanley is, in part, as follows:

"That the defendant W. D. Hanley may maintain his dam in the east fork of Silvies River where the same is now constructed and built on and across said river in section 21, Tp. 23 south, range 31 east, Willamette Meridian, and maintain his ditches leading from said dam as the same are now constructed and built from the 5th day of May each year until the 1st day of July each year, and by means of this said dam and ditches may retain the waters of said Silvies River during said time and divert and use so much thereof as shall be necessary to irrigate sections 27, 35, 21, 23 and 25, the north half of section 22, and north half of the south half of section 22, and the south half of the southeast quarter of section 22, and the west half of section 26, all in township 23 south, range 31 east, Willamette Meridian; that the said W. D. Hanley may maintain his ditch constructed across a portion of the land above described leading out of the east fork of Silvies river on the east side thereof on the south half of section 27 above described and extending southeasterly until it enters into and upon the land of the complainant on or near the southwest quarter of the southeast quarter of section 26, township 23 south, range 31 east, Willamette Meridian, but shall maintain said ditch for the purpose of draining water from the surface of the land above described and not for the purpose of irrigation. If at any time and while the dam of the said W. D. Hanley is open so that it does not obstruct the flow of the water in said river and from natural causes the waters of said east fork of Silvies River shall overflow its banks upon the land of the said W. D. Hanley, or naturally run through either of the ditches of the said W. D. Hanley leading from the

dam of the said W. D. Hanley first above described, said defendant W. D. Hanley shall have the use and enjoyment of so much of the said water of said river as may come upon his land in the manner aforesaid and during such time as the same may run thereon from natural causes and without any obstruction of the channel of said river."

The stipulation and decree also provides as follows:

" 'That the Harney Valley Dam, Ditch and Irrigating Company may maintain its dam in Silvies river as now located and built * * and retain the waters of Silvies river and divert the same during the irrigating season each year by means of certain ditches and sloughs as follows: first, one ditch on the east side of Silvies river commencing at the dam above mentioned, and said ditch shall be 7.6 feet wide at the top, 4.6 feet wide at the bottom, and the water therein 2 feet in depth, and the bottom of said ditch shall be of such grade that the flow shall be one foot in 600 feet in length,' etc."

About thirty-one of the water users in Harney Valley who had appropriated water from Silvies River above the properties of the Pacific Livestock Company were parties to the suit in the federal court in the case mentioned.

The federal decree makes provisions as to the several defendants, other than W. D. Hanley, relating to their respective rights to use the waters of Silvies River and its branches and sloughs for irrigation and domestic use and watering livestock and describes their lands and dams in the streams and other irrigation works and prescribes various dates for the maintenance of their dams and the use of the waters upon their lands for irrigating the same. The form of the decree as to the other defendants is much the same as the decree relating to W. D. Hanley and is based upon the stipulations of the

·various parties.   The bill of complaint was dismissed without prejudice as to some of the defendants.

The findings describe the lands of complainant Pacific Livestock Company and the court found in regard to that company *inter alia* as follows:

"That the complainant has and maintains a dam in the east fork of Silvies River at a point therein situated in section 2, and particularly in the lands purchased by the complainant, as set forth in the bill of complaint, from one H. B. Mace; and has and maintains dams in the west fork of Silvies River as follows: one dam on its lands described as section 36, township 24 south range 31 east; one dam on its lands in the east branch of the west fork of Silvies River described in the complaint as being in section 31, township 24 south range 32 east Willamette Meridian; two dams in its lands described in the complaint as being in said section 31, township 24 south range 31 E., W. M., and as being in the west branch of the west fork of Silvies river; one dam in the east branch of the west fork of Silvies river and in its lands situated in section 32, township 24 south range 32 E., W. M., and that by means of said dams and by ditches leading therefrom the complainant has for many years been diverting water from the several forks of Silvies river for the purpose of irrigating its lands in these findings described."

As we understand the provisions of the decree, in order that complainant Pacific Livestock Company might irrigate its land and use the waters of Silvies River and its branches and sloughs for domestic purposes and watering livestock, the decree enjoined the defendant W. D. Hanley and twenty-six other defendants and intervener Harrison Kelly from

"diverting any of the water of Silvies river and any of the water from the east fork of Silvies River and any of the water from the west fork of Silvies river from the channels of said rivers and from the chan-

nels of each of said rivers; and that they be and they and each of them are perpetually enjoined and restrained and strictly inhibited from impeding the flow of any of said water to and upon the lands of the complainant hereinbefore described as the said water has heretofore been wont to flow thereon when not interfered with by the said defendants and by the said intervener, either jointly or severally. * * "

On April 9, 1908, the Pacific Livestock Company filed in the Circuit Court of the United States for the District of Oregon a supplemental bill of complaint in aid of and for the interpretation of the final decree above referred to and designated as defendants, W. D. Hanley, the Wm. Hanley Company and others who were defendants in the original decree and their successors in interest. Issues were joined and the cause was tried in the United States District Court for Oregon and a decree rendered therein. An appeal was taken to the United States Circuit Court of Appeals. The majority opinion upon the appeal was written by Circuit Judge Ross and a dissenting opinion by Judge Gilbert. After referring to the various provisions of the original decree and the lands belonging to the various parties, it stated, the following:

"The first important thing to do is to ascertain what rights were by that decree adjudged to the complainant and to the defendants Hanley and Levens, what those defendants were permitted to do with respect to the waters there in question, and what they were inhibited from doing."

Then after referring to the various provisions of the original decree, the description of the land then owned by Hanley and various other matters, including a portion of the testimony in the case, the opinion states in part, thus:

"The record shows that the purpose for which the water was necessary for Hanley's land, as well as that of the complainant, was the growing of natural grasses for the use of stock, which use necessarily required the spreading of the water over the ground. And, as the record also shows that Hanley's said land was not level, but contained numerous depressions which run into and form Embree slough and its branches, the building of dams or other impediments to the flow of the water in that slough in order to hold the water back until it overflowed the banks of the slough, and covered all of the surface of the land authorized to be irrigated with it, was a proper, if not the only, way in which he could avail himself of the right conferred upon him by the decree. Of course, in the exercise of that right good faith will always be required by the courts, and the right only extends to the reasonable necessary use of the water for the proper irrigation of the lands specifically described, and confers upon Hanley no right to carry that water beyond the boundaries of his own land."

The original decree was also before the federal court in a contempt proceeding instituted against Hanley, claiming a violation of the decree. The interpretation of the federal decree by the United States District Court for Oregon is found in *Pacific Livestock Co.* v. *Hanley*, 200 Fed. 468, 478, 480 (118 C. C. A. 490), wherein it was adjudged that Foley slough was not embraced in the decree and in *Hanley* v. *Pacific Livestock Co.*, 234 Fed. 522, 525, 528 (148 C. C. A. 288). In the latter case it was held that lands subsequently acquired by parties to the decree but not owned or controlled at the time of the decree by any party thereto were not affected by the decree.

It is plain from the opinions of the federal court and the decree to which we have referred that the

purpose and intent of the same was to make certain provisions for the irrigation of the land of the different parties to the suit. It should be stated here, in view of the fact that the federal decree made general provisions for the regulation of the dams, dikes and levees in the Silvies River and its sloughs or branches, and did not attempt to specify the duty of water or fix a uniform time for the irrigation season, that we believe that it is an easy matter to carry out the spirit of the federal decree although in arranging details such as the duty of water, irrigation season, and perhaps other details, it may be impossible to follow the exact letter of the federal decree. As stated by Judge Ross, the right conferred by the decree "only extends to the reasonable necessary use of the water for the proper irrigation of the lands." The object of the present proceeding is to make provision for and ascertain what amount of water is necessary, and, as near as may be, the time when it should be used for the irrigation of the lands of the various parties interested herein, and to fix the relative dates of priority of the several water users from Silvies River and its tributaries.

About March 29, 1908, the Pacific Livestock Company commenced a suit in the Circuit Court of the United States of the District of Oregon against the Silvies River Irrigation Company and the Harney Valley Improvement Company. The defendant companies were enjoined from proceeding with the work of construction, but the right was reserved to them to apply to the Circuit Court of the United States for the District of Oregon at any time after said decree for the vacation of the injunction, if it should thereafter be determined in some appropriate proceeding that there was any surplus water subject to

appropriation by them. The suit was thereupon appealed to the Circuit Court of Appeals for the Ninth Circuit, which court reversed and remanded said cause with directions to allow the parties a reasonable time to take proceedings before the water board of the State of Oregon, and in the event they did not so proceed within a reasonable time to require all parties interested to interplead and for the lower court to proceed to a determination of the issues between them in accordance with the laws of the State of Oregon: See *Pacific Livestock Co.* v. *Silvies River Irr. Co. et al.*, 200 Fed. 487 (118 C. C. A. 513).

Neither the stipulations nor the decree provide for any time or manner of use of the waters of Silvies River or its branches or sloughs by the Pacific Livestock Company or for its lands described in the decree. It seems to have been contemplated by the parties thereto that after W. D. Hanley and the other defendants, provided for in the decree, had used water reasonably necessary for the irrigation of their respective tracts of land and for their domestic use and for watering livestock on their lands during the periods between the several dates mentioned, there would be a sufficient amount of water left for the needs of the Pacific Livestock Company. The decree does not pertain to all of the lands now owned by the parties thereto, nor to all of the branches or sloughs of the east fork of the river, notably Foley slough.

When the present proceedings were instituted the Pacific Livestock Company pleaded the record of the decree in the federal court in the case mentioned. The same company now suggests in its brief that the whole decree was regulatory in its character, and did not establish any dates of prior-

115 Or.—9

ity for any of the water users in question, nor the amount of water necessary, but merely provided for the regulation of certain dams between certain dates and that at other times the flow of the stream could not be impeded. The Pacific Livestock Company contend that the federal decree and the present adjudication are not workable together. On the part of several claimants, among others William Hanley Company, it is contended that as to the parties to the federal decree, "all rights fixed thereby became vested, fixed and determined for all time." This decree has been interpreted by the United States District Court for Oregon, and the Circuit Court of Appeals for the Ninth Circuit, which is a great assistance in the present proceeding.

Several claimants assign error in the construction of the federal decree treated in finding No. 19 of the trial court and the water board. The typical paragraphs of the decree are quoted above. Finding No. 19 of the trial court reads in part thus: "That a decree of the Circuit Court of the United States for the District of Oregon in the case of *Pacific Livestock Company, a Corporation, Complainant,* v. *W. D. Hanley,* * * (naming all the defendants) was filed in these proceedings."

"That said decree does not establish the dates of priority of any of the water rights in question nor the amount of water necessary to irrigate the lands of the parties to such suit. Such decree upon the stipulation of the parties to the same, pertains to the manner of operating the dams which said parties use to divert the water for the irrigation of their lands. That the irrigation of such lands by any other method than by the use of such dams is not prevented by such decree. That such decree does not attempt to define the irrigation season except for the use of dams. * * "

Here follows a reference to the dams and other artificial works with provisions as to how the same may be maintained for the irrigation of the lands described in the federal decree. The lands of the Pacific Livestock Company are also listed. The finding then proceeds thus:

"That so far as the lands of complainant (Pacific Livestock Company) are concerned said decree prescribed no irrigation season, no certain quantity of water, nor any regulations, except in so far as the dams utilized for the irrigation of the other lands herein described may divert the water from or upon the lands of complainant; that the water master shall distribute the water for the lands described in this finding in accordance with said decree and this finding, so far and so long as such distribution according to such decree, will not interfere with the rights of any water user upon lands not affected by said decree, but in any case wherein the distribution of water in accordance with said decree diverts more water than is necessary for the irrigation of any particular land, or affects the rights of water users upon lands not included in such decree which has an earlier or equal date of priority with the lands described in this decree, then such water master shall regulate such dams and the diversion of water for the lands described herein in accordance with the date of priority of such water users, upon such lands."

32, 33. The law relating to this matter is declared in 3 Kinney on Irrigation (2 ed.), Section 1564, in effect as follows:

The doctrine of appropriation may be deemed a doctrine of fixed rights, and decrees and judgments rendered in actions to adjudicate water rights may award a definite and certain quantity of water to the respective parties and such decrees are deemed *res judicata* as finally settling the rights between such

parties. The common law of riparian rights as to the use of water by riparian owners is not a doctrine of fixed rights. Therefore, a different proposition confronts the court when it comes to the construction of judgments and decrees in cases where they apportion the rights to use the water among the riparian owners on a stream, in those jurisdictions which adhere to the modified common-law rule of riparian rights (such as in the State of Oregon). Such judgments and decrees can usually be regarded as *res judicata* only so long as the conditions upon which they were rendered remain the same. See, also, *William* v. *Altnow,* 51 Or. 276 (95 Pac. 200, 97 Pac. 539); 23 Cyc. 1161, 1290; *Auto Acetylene Light Co. et al.* v. *Presto Light Co., Inc.,* 264 Fed. 810; *Silver Reclam. Dist. 1001,* 41 Cal. App. 326, 329 (182 Pac. 786).

The Pacific Livestock Company contends that the federal decree is unworkable together with the decree in the instant case, while the respondent Wm. Hanley Company contends the reverse. As we have already suggested, there are many details which are not settled by the federal decree as to the parties to the suit in the federal court. It is certain that the construction of that decree should not be left to the water-master. If that official, under the direction of the State Engineer, correctly construes the findings and decree in the instant case, it will be sufficient for him: *In re Umatilla River,* 88 Or. 376, 401 (168 Pac. 922, 172 Pac. 97). Section 5754, Or. L., specifically requires that water decrees must be definite. This is generally the requirement in all water litigation: *Powers* v. *Perry,* 12 Cal. App. 77, 84 (106 Pac. 595); *Rogers* v. *Overacker,* 4 Cal. App. 333, 334 (87 Pac. 1107); *Steinberger* v. *Meyer,* 130 Cal. 156 (62 Pac. 483).

The specific provision for maintaining dams and other works for the irrigation of certain lands for limited periods, contained in finding No. 19, might tend to confusion in the administration of this decree. Such dams and works should be maintained and preserved and many other works constructed as a means for carrying out this decree. However, all artificial works should be operated so as to effectuate this decree which should contain directions for the water-master. "No man can serve two masters." It does not appear to have been the intention of the parties or the court in framing the original federal decree to in an way impede or prevent future legislation in this state, providing the manner of adjudicating water rights for irrigation and other beneficial purposes, or to prevent such an adjudication. These findings and this decree are in addition to such federal decree and carry out the spirit and intent thereof. The federal court invited this proceeding. In other words, the intent expressed in the federal decree should be contained in the present decree.

Finding No. 19 on page 20 of the decree of the Circuit Court will be modified so as to read as follows:

The water-master shall distribute the water for the lands described in these findings and in this decree, in accordance with this decree. The parties whose rights are adjudicated herein, and each of them, are hereby directed and required to regulate, operate and construct and maintain their dams, ditches, canals, headgates, measuring devices, reservoirs and other works, of all kinds and description, used for the purpose of distributing, or aiding in the distribution of the waters of Silvies River system, to or upon the lands de-

scribed in these findings and this decree in such manner as to enable the water-master to divert and apportion the water for said lands, in accordance with the dates of priority of the several water users awarded a water right herein.

In all cases of construction or reconstruction or repairs of dams, canals, ditches, headgates, laterals, or other irrigation works, or systems for appropriating water, or in changing steams, sloughs, branches or depressions used as ditches, or as a means of conducting water from the river for any of the land awarded a right herein, in order to place such slough or branch stream or ditch on the line of the land over which the same runs, or to straighten the same or for any purpose, the water user making such change or building such works or system shall perform such work so as not to hinder or prevent the flow of water to any of the land awarded a right herein. And in the case of such change or reconstruction, a new ditch, flume or conduit for water shall be furnished to take the place of the old, so that the various water users awarded a right herein shall be afforded a means of conducting their water equal to the old method before such change, upon their contributing an equitable part of the labor and expense thereof. In cases where the water formerly ran wholly or in part over one owner's land to that of another without a regular ditch, or other artificial works, and it becomes necessary or convenient to build a ditch or other works, the labor and expense thereof shall be equitably borne by the interested parties. Such work of regulation and construction to be done under the guidance and direction of the State Engineer and water-master; all such new ditches or conduits to be of the size and dimension as directed by the water-master or State Engineer.

All this to the end that the waters of Silvies River and its tributaries may be distributed in accordance with this decree.

34. Error is assigned in finding No. 23 of the trial court, which reads as follows:

"That in all cases where decrees of the court or agreement of the parties have been filed in these proceedings, which said agreements or decrees have not been mentioned in these findings, the water master shall distribute water as between the parties to said decree or said agreements in accordance with said agreements so long as such distribution does not interfere with any prior rights. And whenever the distribution of water in accordance with said decree or agreements does interfere with any prior rights, then said water may be distributed by the water master in accordance with the date of priority as hereinafter tabulated."

This finding, in effect, places the duties of construing decrees and agreements of the parties filed in the proceedings upon the water-master, which leaves the matter too indefinite. In all cases where decrees or agreements have been filed herein, they should be considered and passed upon by the court. In the event that any such decrees or agreements of the parties have been overlooked by the court and have not been passed upon, the Circuit Court is hereby authorized to consider and adjudicate the same. Our attention has not been called to any particular matter of this kind. Finding No. 23 will therefore be eliminated from the decree.

Objections are made upon this appeal to finding No. 32 of the trial court. The intent of this finding is largely provided for in finding No. 19, which we have referred to. Therefore, finding No. 32 will be modified so as to read as follows:

"That in the tabulation hereinafter set forth wherein the rights of diversion are placed from any sloughs that receive their water from the main stream of the Silvies river or its tributaries such diversion shall be considered as being from said main stream of Silvies river or its tributaries as the case may be."

The last portion of finding No. 33 of the trial court pertaining to the irrigation season is hereby amended so as to read as follows:

"That the irrigation season, during which the water users from Silvies river and its tributaries shall be entitled to the use of the water for irrigation purposes, extends from March 20th to September 1st of each year provided, however, that as irrigation depends upon climatic conditions and changes in the season, the season hereby fixed shall not prevent water users awarded a right herein to use the water of Silvies river and its tributaries for the purposes of irrigation according to their relative rights of priority, and in quantities in accordance with this decree, at other times when such use will be beneficial to the land and the crops grown thereon when the ground is not frozen and the same can be used without needless waste."

## Duty of Water.

Finding No. 33 embraces the very important matter of the duty of water. It is in evidence that the duty of water for irrigation in Harney Valley cannot with safety be absolutely fixed for all time; that the development of the country, the cultivation and irrigation of the land after the construction of proper irrigation works will afford means for a better understanding of the question. The trial court very wisely left the question of duty of water open for future adjudication. This we approve. After suitable works are constructed for the purpose of

controlling and distributing and measuring the water for irrigation in Harney Valley, actual tests of the amount necessary for the proper irrigation of the land should be made in different localities under the supervision of the water-master so that the matter can be presented to the Circuit Court with the other evidence herein, before the duty of water is finally determined.   The water board found as follows:

"That all lands in Harney Valley irrigated or to be irrigated from Silvies river or its branches or tributaries, and all lands not in Harney valley irrigated or to be irrigated from Silvies river, are entitled to not exceed one-eightieth of one cubic foot of water per second for each acre of such lands. That all lands not in Harney Valley irrigated or to be irrigated from tributaries of Silvies river are entitled to not to exceed one-sixtieth of one cubic foot of water per second for each acre of such lands."

It appears from the State Engineer's report: "that 1.3 acre-feet of water per acre is sufficient to irrigate the land in Harney valley." The Circuit Court as a part of its finding No. 33 declared thus:

"That all lands in Harney Valley irrigated or to be irrigated from Silvies river or its branches or tributaries, and all lands not in Harney Valley irrigated or to be irrigated from Silvies river, are entitled to not to exceed one-eightieth of one cubic foot of water per second for each acre of such lands, and not to exceed three acre feet per acre.   It appearing that during the spring and early summer there is a large flow of water in Silvies river and its tributaries, and that heretofore the water users have used a large head of water during such time and should be permitted to continue the use of more than one-eightieth of a cubic foot per acre in order to approximate the quantity to which they are entitled for the irrigation season; therefore, the right to the use of water from Silvies river and its tribu-

taries, except as modified by special findings herein, shall be limited to the diversion of not to exceed one and one-half acre feet per acre during any period of thirty days, prior to June first of each year, and thereafter not to exceed one acre foot per acre during any period of thirty days, provided that the total quantity of water diverted during the irrigation season shall not exceed three acre feet per acre, and that the rate of flow shall not exceed one-fortieth of a cubic foot per second per acre, except where rotation is practiced as herein provided.''

We believe that while this liberal provision may be necessary for a time, until many of the water users in Harney Valley have more complete irrigation systems, yet in effect it will induce a continuance of wasteful natural methods of irrigation. Therefore, the duty of water as fixed and determined by the Circuit Court will remain so fixed for and during the time of not longer than three years from and after the date of the filing of the mandate of this court in this proceeding in the Circuit Court. After that time the duty of water will be fixed and the finding in that regard in No. 33 will be changed so as to be and read as follows:

That all lands in Harney Valley irrigated or to be irrigated from Silvies River or its branches or tributaries, and all lands not in Harney Valley irrigated or to be irrigated from Silvies River, are entitled to not to exceed 1/80th of one cubic foot of water per second for each acre of such lands; provided that the total quantity of water diverted during an irrigation season shall not exceed two acre feet per acre; that all lands not in Harney Valley, irrigated or to be irrigated from tributaries of Silvies River are entitled to not exceed 1/60th of one cubic foot of water per second for each acre of such lands, provided that the total quantity of water diverted

during an irrigation season shall not exceed two acre-feet per acre; provided, however, that when the ditches, canals headgates, measuring devices, and other irrigation systems necessary to permit a determination with reasonable accuracy of the amount of water necessary for the irrigation of such lands shall be constructed and actual tests have been made, the amount allowed by this decree may be changed by the Circuit Court and the duty of water will be left open for further determination at a future time.

In finding No. 33 the trial court modified the finding of the water board No. 32 as to the duty of water, but in the tabulation of the court, under the column headed "Amount Cubic Feet per Second," the court did not change the figures of the water board for the lands not in Harney Valley which were figured at one-sixtieth of a cubic foot per second and not one-eightieth of a cubic foot.

In view of the fact that the duty of water and the amount of cubic feet per second per acre is subject to being changed in the future, the figures in the column mentioned will not be changed, but will be deemed to be corrected in amount in accordance with the general findings. When it is determined what changes will be made in the duty of water for the lands awarded a right herein, the Circuit Court, or the State Engineer under the direction of the Circuit Court, is hereby authorized to correct the tabulation in accordance with the decree of the court; such correction may be made in the original decree as modified if deemed expedient.

35, 36. J. T. Baker and several appellants assign error of the court in finding No. 26 as to where the right to the use of water out of more than one stream or branch is decreed, the amount of water so deter-

mined "may be used out of either or both of said streams." The import of this finding is not easy to determine. It may cause a conflict. Therefore, finding No. 26 will be modified so as to read as follows:

In all cases in this decree, wherein the right to use water out of more than one stream or branch of a stream is confirmed for the same land, and the amount of water to be taken from each respective stream or branch is not determined herein, the matter of determining the quantity of water to be taken from each stream or branch for such land shall be left open for the Circuit Court to determine after actual experiment and use of the water upon the lands have been made so that an equitable apportionment of the amount to be used from each stream or branch can be made with a reasonable degree of accuracy, which cannot be done at the present time.

Appellants allege that the court erred in failing to find that recent construction of irrigation works by the Pacific Livestock Company and William Hanley Company diverted and carried away water from the east fork of the river to lands not entitled to the use of the same to the deprivation of the lands entitled thereto.

Particular mention is made of Black slough and other sloughs in the vicinity thereof in the testimony taken on rehearing. From a careful reading of the testimony we think we understand why the trial court did not directly pass upon this question. It is believed that the whole matter can be regulated in the administration of this decree; that the water entering the sloughs can be regulated by proper headgates which must be constructed, or by dams or levees, under similar provisions made in finding No. 19. The provision of this finding No. 19,

as modified, must be considered and shall apply to any and all construction or reconstruction, or change in ditches, branches, sloughs or other conduits of water from the river to the lands involved herein, subsequent to the date of the order of determination of the water board. We believe that a little neighborly co-operation in the administration of this decree and the construction of works therefor will smooth out all of the matter complained of.

The Circuit Court is hereby authorized to make corrections of any clerical errors in these proceedings within six months from the date of filing the mandate of this court in the Circuit Court. The writer will welcome the calling attention to any oversight herein, by pointing out the issue and mentioning the volumes and pages of the testimony relating thereto.

Commencing three years after the filing of the mandate of this court in this proceeding in the Circuit Court, any and all waste in the use of water by the parties awarded a right to the use of water from Silvies River and its tributaries, branches and sloughs, is hereby strictly enjoined and inhibited.

With the modifications and exceptions above mentioned, the decree of the Circuit Court is affirmed. Each of the parties will be required to pay his, her or its own costs.                          MODIFIED.

Mr. Justice RAND did not sit in this case.

Mr. Justice BROWN did not sit in this case.

Mr. Justice BELT did not sit in this case.

Mr. Justice BURNETT concurs in the result.